KELLEY DRYE & WARREN LLP
   Tahir L. Boykins (State Bar No. 323441)
   tboykins@kelleydrye.com
10100 Santa Monica Boulevard
Los Angeles, CA 90067-4008
Telephone:  (310) 712-6100
Facsimile:  (310) 712-6199

KELLEY DRYE & WARREN LLP
   Michael C. Lynch (*pro hac vice*)
   mlynch@kelleydrye.com
   Andrea L. Calvaruso (*pro hac vice*)
   acalvaruso@kelleydrye.com
101 Park Avenue
New York, NY 10178
Telephone:   (212) 808-7800
Facsimile:    (212) 808-7897

Attorneys for Bacardi & Company Limited,
Bacardi U.S.A., Inc. and Bacardi Limited

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LODESTAR ANSTALT, a Liechtenstein company,<br><br>               Plaintiff,<br><br>      v.<br><br>BACARDI & COMPANY LIMITED, a Liechtenstein company, BACARDI U.S.A., Inc., a Delaware corporation, and BACARDI LIMITED, a Bermuda company,<br><br>               Defendants.<br><br>―――――――――――――<br>AND RELATED COUNTERCLAIMS. | Case No.  2:16-cv-06411-CAS-FFMx<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56**<br><br>Date:  June 17, 2019<br>Time:  10:00 a.m.<br><br>Judge:  Hon. Cristina A. Snyder<br>Place:  Courtroom 8D<br><br>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................... 1

II.   FACTUAL AND PROCEDURAL BACKGROUND .................................. 2

      A.    THE "BACARDI UNTAMEABLE SINCE 1862" CAMPAIGN ...... 2

      B.    LODESTAR AND THE PURPORTED UNTAMED MARKS ........ 2

III.  SUMMARY JUDGMENT OF ALL CLAIMS IS WARRANTED ............. 5

      A.    PLAINTIFF MADE NO BONA FIDE USE OF THE
            UNTAMED MARKS BEFORE THE BACARDI AD
            CAMPAIGN ................................................................... 6

      B.    NO LIKELIHOOD OF CONFUSION EXISTS ............................... 9

            1.    The UNTAMED MARKS Are Weak ................................... 9

            2.    The Parties' Respective Uses in the Marketplace are
                  Different ...................................................................10

            3.    The Parties' Products Are Not Similar ................................12

            4.    There is No Evidence of Actual Confusion ..........................13

            5.    The Parties' Marketing Channels Are Different ....................14

            6.    Consumers Exercise Care in Buying Alcoholic Beverages ....15

            7.    Defendants' Mark Was Selected in Good Faith.....................15

            8.    There is No Likelihood of Further Expansion .......................16

IV.   EVEN IF LODESTAR COULD ESTABLISH LIABILITY, IT IS NOT
      ENTITLED TO MONETARY RELIEF AS A MATTER OF LAW ..........17

      A.    LODESTAR IS NOT ENTITLED TO A DISGORGEMENT OR
            ATTORNEYS' FEES ........................................................17

      B.    LODESTAR IS NOT ENTITLED TO ACTUAL DAMAGES ........19

            1.    There is No Evidence that Lodestar Suffered an Injury..........20

            2.    Lodestar Fails to Prove the Amount of Damages ..................22

      C.    LODESTAR IS NOT ENTITLED TO MONETARY RELIEF
            UNDER CALIFORNIA LAW .......................................................24

V.    CONCLUSION ...............................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000) ...............................................................10

*Adray v. Adry-Mart, Inc.*,
    76 F.3d 984 (9th Cir. 1995)................................................................18

*AMF, Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979)................................................................9

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...............................................................................5

*Anhing Corp. v. Thuan Phong Co. Ltd.*,
    No. CV1305167BROMANX, 2016 WL 6661178 (C.D. Cal. Jan. 25,
    2016) .....................................................................................................19

*Auburn Farms, Inc. v. McKee Foods Corp.*,
    51 U.S.P.Q.2d 1439 (1999)....................................................................8

*Behr Process Corp. v. RPM Int'l, Inc.*,
    No. CV 14-156-JLS 2014 (DFMx), U.S. Dist. LEXIS 195349 (C.D.
    Cal. Feb. 14. 2014).............................................................................11

*Binder v. Disability Group, Inc.*,
    772 F. Supp. 2d 1172 (C.D. Cal. 2011) ...........................................23

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*,
    174 F.3d 1036 (9th Cir. 1999)......................................................10, 15

*Chesebrough-Pond's, Inc. v. Faberge, Inc.*,
    666 F.2d 393 (9th Cir. 1982)..............................................................12

*Cleary v. News Corp.*,
    30 F.3d 1255 (9th Cir. 1994)................................................................6

*Cohn v. Petsmart, Inc.*,
    281 F.3d 837 (9th Cir. 2002)........................................................11, 14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Color Me Mine Enterprises Inc. v. S. States Mktg. Inc.*,
   No. CV1200860RGKJCX, 2013 WL 12119715 (C.D. Cal. Apr. 25, 2013) ..................................................................................................19, 24

*Computer Access Tech. Corp. v. Catalyst Enterprises, Inc.*,
   273 F. Supp. 2d 1063 (N.D. Cal. 2003) ...........................................21, 24

*Glob. Apogee v. Sugarfina, Inc.*,
   No. CV 18-5162-RSWL-E, 2018 WL 4945305 (C.D. Cal. Oct. 10, 2018) ..................................................................................................25

*Groupion LLC v. Groupon, Inc.*,
   859 F. Supp. 2d 1067 (N.D. Cal. 2012) ................................. 11, 12, 16, 17, 19, 25

*Hush Hush Sound, Inc. v. H & M Hennes & Mauritz LP*,
   No. 2:17-CV-07668-RGK-SS, 2018 WL 4962086 (C.D. Cal. Jan. 26, 2018) ..................................................................................................25

*Hydramedia Corp. v. Hydra Media Grp. Inc.*,
   392 F. App'x 522 (9th Cir. 2010) ...................................................17, 18

*Imperial Tobacco, Ltd. v. Philip Morris, Inc.*,
   899 F.2d 1575 (Fed. Cir. 1990) .........................................................6, 7

*Int'l Oddities v. Record*,
   No. CV 12-3934-CAS VBKX, 2013 WWL 3864050 (C.D. Cal. July 22, 2013) ..................................................................................................22

*J.T. Colby & Co. v. Apple Inc.*,
   No. 11 CIV. 4060 DLC, 2013 WL 1903883 (S.D.N.Y. May 8, 2013)
   *aff'd*, No. 13-2227-CV, 2014 WL 4799139 (2d Cir. 2014) ...............10

*La Societe Anonyme des Parfums le Galion v. Patou, Inc.*,
   495 F.2d 1265 (2d Cir. 1974) ..............................................................8

*Levi Strauss & Co. v. GTFM, Inc.*,
   196 F. Supp. 2d 971 (N.D. Cal. 2002) ..................................................7

*Lindy Pen Co. v. Bic Pen Corp.*,
   982 F.2d 1400 (9th Cir. 1993) .......................................................19, 22

*Lipton Industries, Inc. v. Ralston Purina Co.*,
   670 F.2d 1024 (C.C.P.A. 1982) ...........................................................8

*Los Defensores, Inc. v. Gomez*,
　　223 Cal. App. 4th 377, 166 Cal. Rptr. 3d 899 (2014) .......................................25

*M2 Software Inc., v. Madacy Entm't*,
　　421 F.3d 1073 (9th Cir. 2005) ......................................................................6, 15

*M2 Software Inc. v. Viacom Inc.*,
　　223 F. App'x 653 (9th Cir. 2007) ..............................................................18, 24

*Machine Head v. Dewey Global Holdings, Inc.*,
　　No. C 99-04326 CW, 2001 U.S. Dist. LEXIS 22759 (N.D. Cal. Dec.
　　13, 2001) .......................................................................................................17

*Master, Ltd. v. Zobmondo Entertainment, LLC*,
　　944 F. Supp. 2d 830 (C.D. Cal. 2012) ............................................................17

*Matrix Motor Co. v. Toyota Jidoshas Kabushiki Kaisha*,
　　290 F. Supp. 2d 1083 (C.D. Cal. 2003) ..................................... 9, 10, 11, 13, 16

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
　　331 F. Supp. 2d 1214 (C.D. Cal. 2004) .........................................................9, 11

*Natural Answers, Inc., v. SmithKline Beecham Corp.*,
　　529 F.3d 1325 (11th Cir. 2008) .......................................................................6, 8

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
　　638 F.3d 1137 (9th Cir. 2011) .......................................................................6, 15

*New Milani Group, Inc. v. J.T. Bella, LLC*,
　　No. CV 12-10612, 2013 WL 12116579 ............................................................12

*Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*,
　　No. 14-CV-04853-PSG, 2015 WL 9028123 (N.D. Cal. Dec. 16,
　　2015) ................................................................................................ 15, 17, 18

*Oculu, LLC v. Oculus VR, Inc.*,
　　No. SACV 14-0196 DOC, 2015 WL 3619204 (C.D. Cal. June 8,
　　2015) ................................................................................................... 14, 17

*Pogrebnoy v. Russian Newspaper Distribution, Inc.*,
　　289 F. Supp. 3d 1061, 1072 (C.D. Cal. 2017), *aff'd*, 742 F. App'x
　　291 (9th Cir. 2018)..........................................................................................18

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Powermatics, Inc. v. Globe Roofing Products Co.*,
   52 C.C.P.A. 950 (1965) ...................................................................7

*Ex parte Procter & Gamble Co.*,
   96 U.S.P.Q. 272 (Chief Examiner 1953) ..........................................8

*The Proctor & Gamble Co. v. Johnson & Johnson, Inc.*,
   485 F. Supp. 1185 (S.D.N.Y. 1979) ................................................8

*QS Wholesale, Inc. v. World Mktg., Inc.*,
   No. SA 12-CV-0451 RNBX, 2013 WL 1953719 (C.D. Cal. May 9,
   2013). ............................................................................................23

*Quia Corp. v. Mattel, Inc.*,
   No. C 10-1902 JF HRL, 2011 WL 2749576 (N.D. Cal. July 14,
   2011) .......................................................................................23, 24

*Rearden LLC v. Rearden Commerce, Inc.*,
   683 F.3d 1190 (9th Cir. 2012) .........................................................6

*Sazerac Co. v. Fetzer Vineyards, Inc.*,
   265 F. Supp. 3d 1013, 1035 (N.D. Cal. 2017) .......................13, 15, 16

*Scat Enterprises, Inc. v. FCA US LLC*,
   No. CV 14-7995-R, 2017 WL 5896182 (C.D. Cal. June 8, 2017) ...............17, 18

*Sodima v. Int'l Yogurt Co.*,
   662 F. Supp. 839 (D. Ore. 1987) .....................................................7

*Stonefire Grill, Inc. v. FGF Brands, Inc.*,
   987 F. Supp. 2d 1023 (C.D. Cal. 2013) ....................... 9, 11, 12, 16, 19

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
   839 F.3d 1179 (9th Cir. 2016) .......................................................19

*Surfvivor Media, Inc. v. Survivor Productions*,
   406 F.3d 625 (9th Cir. 2005)..............................................9, 12, 13

*THOIP v. Walt Disney*,
   736 F. Supp. 2d 689 (S.D.N.Y. 2010) ...........................................15

*Tokidoki, LLC v. Fortune Dynamic, Inc.*,
   No. CV 07-1923DSF(PJWX), 2009 WL 2366439 (C.D. Cal. July
   28, 2009)..................................................................................23, 24

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Vitaline Corp. v. Gen. Mills*, *Inc.*,
    891 F.2d 273 (Fed. Cir. 1989) ............................................................. 6

*Walter v, Mattel, Inc.*,
    31 F. Supp. 2d 751 (C.D. Cal. 1998) ................................................... 4

**Statutes**

Lanham Act, 15 U.S.C. § 1117(a) ............................................... 17, 18, 19

Lanham Act Section 43(a), 15 U.S.C. § 1125 ......................................... 5

Lanham Act, 15 U.S.C. § 1127 ............................................................... 6

Lanhan Act Section 66(a), 15 U.S.C. § 1141f ......................................... 5

California Business & Professions Code § 17200 ..................... 5, 6, 19, 25

California Civil Code § 3294 ................................................................ 19

Fed. R. Civ. P. 56(a) ............................................................................... 5

**Other Authorities**

McCarthy on Trademarks and Unfair Competition ......................... 6, 7, 8, 11, 12, 16

Survey Percentages in Lanham Act Matters, S. S. Diamond and J. B.
    Swann, *Trademark and Deceptive Advertising: Law* ........................... 14

1   Defendants and Counterclaimants Bacardi & Company Limited ("Bacardi &

2   Co."), Bacardi U.S.A., Inc. ("Bacardi U.S.A."), and Bacardi Limited (collectively,

3   "Defendants"), respectfully move this Court for summary judgment on all of Plaintiff

4   Lodestar Anstalt's ("Plaintiff" or "Lodestar") claims and Defendants' counterclaims.

5   Defendants move in the alternative for partial summary judgment on Plaintiff's claims

6   for monetary relief.

7   ## I.   INTRODUCTION

8   In November 2013, the BACARDI brand launched an ad campaign for its rum

9   products featuring the tagline "Bacardi Untameable Since 1862" based on its storied

10  brand history (the "BACARDI Ad Campaign"). Prior to that campaign, Plaintiff had

11  allegedly sold a small quantity of whiskey in the U.S. branded THE WILD GEESE

12  SOLDIERS & HEROES, which included a decorative design of a heart and sword

13  with the word "Untamed" in small letters.[1] Plaintiff had obtained a U.S. Trademark

14  Registration for that design, and for the stylized word UNTAMED for a variety of

15  beverages, based on a foreign filing without proving use in commerce.[2] *More than a*

16  *year after the BACARDI Ad Campaign launched,* ███████████████████

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████

19  Lodestar thereafter commenced this action alleging that the tagline "Bacardi

20  Untameable Since 1862" was likely to confuse consumers into believing that its

21  products were associated with BACARDI. Summary judgment is warranted because:

22  (1) Plaintiff abandoned any purported rights to the UNTAMED MARKS before

23  Defendants launched the BACARDI Ad Campaign; (2) there is no likelihood of

24  confusion; and (3) there is no evidence that Lodestar suffered any injury or that

25

26  _____

27  [1] The word "Untamed" was also used in some advertising copy for these products that were distributed primarily to the trade and not consumers.

28  [2] These registrations were later limited to rum, whiskey and distilled spirits based on Plaintiff's admission that it had no use of the marks for the dozens of other goods listed in the registration. (SUF 35-36, 39, 48-50).

1   Defendants' alleged infringement was willful.

2   **II.    FACTUAL AND PROCEDURAL BACKGROUND**

3       **A.    The "Bacardi Untameable Since 1862" Campaign**

4       Defendants and/or their affiliates or predecessors have used the mark

5   BACARDI for rum since 1862 and continuously thereafter. (SUF 83).[3] In or around

6   May 2012, the BACARDI brand decided to create a new ad campaign focused on the

7   history of the Bacardi family and brand. (SUF 86). BETC London, an outside ad

8   agency, came up with the "Bacardi Untameable Since 1862" tagline to convey the

9   challenges that the Bacardi family and brand have overcome, including prohibition

10  and the family's exile from Cuba in the 1960s. (SUF 87, 88). Ciara O'Meara, one of

11  BETC London's creatives, proposed the word "untameable" after researching the

12  BACARDI brand and learning from its Wikipedia page[4] that it "'tamed' rum to be a

13  clear liquid during the distilling process." (SUF 89). She testified: "The creative brief

14  I was given asked us to focus on Bacardi's irrepressible spirit and therefore I thought

15  that Bacardi, both the family and liquid, are in fact 'untameable' for the way they

16  behave." (*Id.*) Ms. O'Meara further testified that, when she proposed the idea, she had

17  no knowledge of Lodestar, Avalon, Protégé, TWGS&H brand, or the purported

18  UNTAMED MARKS. (SUF 91). On July 17, 2013, Bacardi & Co. filed an application

19  in the USPTO for the mark BACARDI UNTAMEABLE with a claimed priority date

20  of February 20, 2013.[5] (SUF 98). From November 2013 through approximately April

21  2017, Bacardi U.S.A. used that mark in advertising (*not* on products) to promote the

22  sale of BACARDI branded rum in the U.S. (SUF 99-100). ████████████████

23  ██████████████████████████████ (SUF 109).

24      **B.    Lodestar and The Purported UNTAMED MARKS**

25

26  ───────────────────

[3] Bacardi & Co. owns numerous registrations with the U.S. Patent and Trademark
27  Office ("USPTO") for the mark BACARDI. (SUF 85).
[4] The word "tamed" first appeared on BACARDI's Wikipedia page as early as
28  January 2, 2002. (SUF 90).
[5] Bacardi & Co.'s priority date is based upon its filing in Liechtenstein. (SUF 98).

This case involves three related entities created by Andre Levy: (1) Lodestar, a Liechtenstein Anstalt formed on June 19, 2000 for the purpose of holding trademarks; (2) Avalon Group, Inc., a British Virgin Island company formed around 2000 and later reorganized into Avalon International Management, Inc., a Panama company (collectively, "Avalon"), which is alleged to be the exclusive licensee of Lodestar's trademarks and contracts with other companies to manufacture and sell products bearing those marks; and (3) Protégé International Limited, a United Kingdom company formed around 2001 and later reorganized into Protégé International, a Cyprus company (collectively, "Protégé"), which is alleged to be a brand development agency with responsibility for advertising and marketing Avalon's products. (SUF 4, 8-12, 14). Mr. Levy claims to serve as Lodestar's "nonexecutive chairman" and "trademark advisor," and as Protégé's "chairman," with responsibility for the company's overall strategic direction and assets. (SUF 5, 13).

In or around 2000, Mr. Levy began developing a whiskey brand called The Wild Geese, for which he appropriated to himself the story of the Irish diaspora who were forced to leave Ireland following the Treaty of Limerick. (SUF 1-3). Lodestar purports to own all intellectual property related to The Wild Geese brand, but allegedly licensed those rights to Avalon, including the exclusive worldwide right to use Lodestar's marks for alcoholic beverages. (SUF 9, 112).[6]

In 2005, when the owner of the Wild Turkey bourbon brand opposed Lodestar's Wild Geese marks in the U.S. (SUF 16), Mr. Levy changed "The Wild Geese" to "The Wild Geese Soldiers & Heroes" ("TWGS&H") on bottles sold in the U.S. (SUF 17). Plaintiff alleges it began selling Irish whiskey in the U.S. in 2009 under the brand name TWGS&H, which appeared prominently on the front label of all whiskey bottles. (SUF 18, 37). On October 4, 2011, Lodestar obtained U.S. trademark

---

[6] Although Lodestar claims not to possess any record of the alleged exclusive license agreement with Avalon, Mr. Levy testified that the agreement did *not* call for the payment of any royalties to Lodestar. (SUF 9, 112).

registrations in connection with certain alcoholic beverages for two "Untamed" marks:

 (the "UNTAMED DESIGN")          UNTAMED          (the "UNTAMED WORD MARK")

(collectively, the "UNTAMED MARKS"), which issued without proof of use pursuant to Section 66(a) of the Lanham Act.[7] (SUF 20). Prior to the BACARDI Ad Campaign, Plaintiff allegedly used only the UNTAMED *DESIGN*, and did so only on *whiskey* bottles—and no other products—in the following decorative manner:



███████████████████████████████████████████████████

████████████████████ (SUF 37). ████████████████████████

████████████████████████████████ (SUF 38). ████████████

███████████████████████████████████████████████████████

██████████████████████████████ (SUF 19). ████████████████

███████████████████████████████████████████████████ (SUF

---

[7] While use in commerce may not be required to obtain a Section 66(a) registration, such registrations are subject to cancellation on the basis of nonuse, regardless of the continued validity of the home registration. *See SaddleSprings, Inc. v. Mad Croc Brands, Inc.*, Cancellation No. 92055493 at 9 (T.T.A.B. Sept. 25, 2012).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT

23). ███████████████████████████████████████████████████

███████████████████████████████████████ (SUF 22). ████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████



██████████████████████████████████████████████████████████████

████████████████████████████ (SUF 27, 42-45).

## III.   SUMMARY JUDGMENT OF ALL CLAIMS IS WARRANTED[8]

Plaintiff asserts: (1) trademark infringement based on reverse confusion in violation of Section 32(1) of the Lanham Act, and (2) unfair competition in violation of Section 43(a) of the Lanham Act, California Business & Professions Code § 17200,

---

[8] Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, but it need not disprove the other party's case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986). Once the movant establishes the absence of any genuine issue of material fact, the burden shifts to the non-moving party to set out specific material facts showing a genuine issue for trial. *Id.* at 248-49.

1  and common law. (Dkt. 1). To establish these claims, Plaintiff must demonstrate: (1)

2  its ownership of a valid mark, and (2) Defendants' use of a confusingly similar mark

3  that is likely to cause consumer confusion as to the origin or sponsorship of Plaintiff's

4  products. *See Network Automation*, *Inc. v. Advanced Sys. Concepts*, *Inc.*, 638 F.3d

5  1137, 1144 (9th Cir. 2011).[9] To defeat Defendants' motion, Plaintiff must show that

6  confusion is "probable," not merely "possible." *M2 Software Inc., v. Madacy Entm't*,

7  421 F.3d 1073, 1085 (9th Cir. 2005). Plaintiff cannot meet this burden.

8  **A.   PLAINTIFF MADE NO *BONA FIDE* USE OF THE UNTAMED**
   **MARKS BEFORE THE BACARDI AD CAMPAIGN**

9
10 A mark is used "on goods" when it is "placed in any manner on the goods or

11 their containers or the displays associated therewith or on the tags or labels affixed

12 thereto." *Id*. It is "not enough to have invented the mark first or even to have registered

13 it first, the party claiming ownership must have been the first to actually use the mark

14 in the sale of goods or services."[10] *Rearden LLC v. Rearden Commerce*, *Inc.*, 683 F.3d

15 1190, 1220 (9th Cir. 2012).

16 A trademark is "abandoned" if "its use has been discontinued with intent not to

17 resume such use." 15 U.S.C. § 1127. "Intent not to resume may be inferred from

18 circumstances," 15 U.S.C. § 1127, where there is no intent to resume use "within the

19 reasonably foreseeable future." *Natural Answers*, *Inc., v. SmithKline Beecham Corp.*,

20 529 F.3d 1325, 1329 (11th Cir. 2008); *see also Vitaline Corp. v. Gen. Mills*, *Inc.*, 891

21 F.2d 273, 275 (Fed. Cir. 1989); McCarthy on Trademarks and Unfair Competition

22 ("McCarthy") § 17:18. "Nonuse for 3 consecutive years shall be *prima facie* evidence

23 of abandonment," 15 U.S.C. § 1127, thereby "eliminat[ing] the challenger's burden

24 to establish. . . intent[.]" *Imperial Tobacco*, *Ltd. v. Philip Morris*, *Inc.*, 899 F.2d 1575,

25

26 [9] *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994) ("actions pursuant to
   California Business and Professions Code § 17200 are 'substantially congruent' to
   claims made under the Lanham Act").

27 [10] There are some inapplicable exceptions to this rule. *See*, *e.g.*, Trademark Manual
   of Examining Procedure ("TMEP") § 201.02 (Constructive Use Priority). Regardless,

28 *bona fide* use in commerce is required to acquire and maintain trademark rights.

1579 (Fed. Cir. 1990). Once a period of nonuse results in abandonment, subsequent use cannot cure that abandonment. *Sodima v. Int'l Yogurt Co.*, 662 F. Supp. 839, 850 (D. Ore. 1987) (upholding competitor's use and cancelling plaintiff's mark where plaintiff failed to use mark for over four years before resuming use, during which time a competitor began using a similar mark); McCarthy § 17:3.

As an initial matter, Plaintiff cannot prove that Avalon made use of the UNTAMED MARKS pursuant to a valid license from Plaintiff. (SUF 9). Thus, Plaintiff cannot prove that it made any *bona fide* trademark use of the UNTAMED MARKS based on Avalon's conduct as a matter of law. Even if, *arguendo*, Plaintiff had validly licensed the UNTAMED MARKS to Avalon, Plaintiff cannot prove *bona fide* use of those marks in U.S. commerce because: (1) no products branded with the UNTAMED WORD MARK were offered for sale in U.S. commerce prior to the launch of the Bacardi Ad Campaign (SUF 42-43, 45)[11], and (2) *no rum* products branded with the UNTAMED DESIGN were offered for sale in U.S. commerce (SUF 40-41). This constitutes *prima facie* abandonment of those marks.[12] Moreover,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████[13] (SUF 22-23, 110).

The decision to **commence** use of the UNTAMED WORD MARK on rum bottles in December 2014, over a year *after* the launch of Defendants' campaign, does

---

[11] Even if Lodestar could establish use of the UNTAMED WORD MARK on *advertisements* for whiskey, use in advertising does not constitute use in commerce sufficient to create trademark rights. *See Powermatics, Inc. v. Globe Roofing Products Co.*, 52 C.C.P.A. 950, 954 (1965); McCarthy § 16:29.

[12] *Levi Strauss & Co. v. GTFM, Inc.*, 196 F. Supp. 2d 971, 977 (N.D. Cal. 2002).

[13] Lodestar registered the UNTAMED MARKS on October 4, 2011 (SUF 20), meaning the presumptive abandonment period expired on October 4, 2014. *Imperial Tobacco*, 899 F.2d at 1579.

1    not retroactively create trademark rights.[14] *Int'l Yogurt Co.*, 662 F. Supp. at 850;

2    *Auburn Farms, Inc. v. McKee Foods Corp.*, 51 U.S.P.Q.2d 1439 (1999); McCarthy §

3    17:3.

4         In any event, the *nature* of Plaintiff's alleged use of the UNTAMED MARKS

5    does not confer trademark rights for a number of reasons. **First,** s████████████

6    ████████████████████████████████████████████████████████████████████

7    ███████████████████████████████████████████ is *de minimus* use that does not

8    constitute *bona fide* use in commerce. (SUF 27, 43-45). *See, e.g.*, *Lipton Industries,*

9    *Inc. v. Ralston Purina Co.*, 670 F.2d 1024, (C.C.P.A. 1982) (two shipments not *bona*

10    *fide* use); *La Societe Anonyme des Parfums le Galion v. Patou, Inc.*, 495 F.2d 1265,

11    1274 (2d Cir. 1974) (89 bottles of perfume over 20 years insufficient to maintain

12    rights); *The Proctor & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F. Supp. 1185

13    (S.D.N.Y. 1979) (50 cases of shampoo per year not *bona fide* use). This is particularly

14    true where, as here, a small first shipment was not followed by increased or continued

15    sales. *See* McCarthy §§ 16:8, 19:108-114, 116.

16         **Second**, use of the UNTAMED WORD MARK only ***on the back*** of TWGS&H

17    rum products under a substantial amount of dense text, and use of the UNTAMED

18    DESIGN *decoratively* on TWGS&H whiskey products in a manner that Lodestar's

19    marketing expert described as "very small compared to everything else on the bottle"

20    (SUF 51, 102), do not constitute *trademark use* because those marks do not identify

21    a commercial source. *See* TMEP § 1202.03 (decorative features do not "identify and

22    distinguish" goods and thus do not "function as a trademark"); *Ex parte Procter &*

23    *Gamble Co.*, 96 U.S.P.Q. 272 (Chief Examiner 1953) (IT FLOATS on IVORY soap

24

25    _____

26    [14]Lodestar does not even *allege* use of the UNTAMED WORD MARK prior to the launch of the BACARDI ad campaign. (Dkt. 1 ("Lodestar has made use of one or more of the UNTAMED marks on rum products" "[s]ince at least **2014.**"). Regardless,

27    "if all a party had to do to avoid a finding of abandonment was to aver that it never intended to abandon the trademark, then no trademark would ever be abandoned, no matter how long its use had been withdrawn from the market, or how inchoate and

28    speculative any intention to resume its use." *Natural Answers*, 529 F.3d at 1330.

1  labels did not function as a trademark because it appeared at the bottom of the labels

2  in small print). As Lodestar's own marketing expert also testified:

3  > most products do have the brand on the front because they want you to
   > be able to find it on the shelf and they want you to be able to pick it out.

4  > So what's the basis for that? 45 years of research and marketing and
   > examining products on shelves and talking to marketers. Nobody –

5  > **nobody doesn't put their brand on the front.**

6  (SUF 52) (emphasis added).

7  ## B.    NO LIKELIHOOD OF CONFUSION EXISTS

8          In assessing the likelihood of confusion, courts consider the marks' strength

9  and similarities; the relatedness of the goods; evidence of actual confusion; the

10 marketing channels used; the degree of care exercise by purchasers; the defendant's

11 intent in selecting its mark; and the likelihood of expansion of the product lines. *AMF*,

12 *Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). Actionable confusion

13 "must be 'probable, not simply a possibility,'" *Matrix Motor Co. v. Toyota Jidoshas*

14 *Kabushiki Kaisha*, 290 F. Supp. 2d 1083, 1090 (C.D. Cal. 2003), and is adjudged

15 assuming the actions of a "reasonably prudent consumer in the marketplace."

16 *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1046 (C.D. Cal.

17 2013). Summary judgment is appropriate where, as here, the evidence compels a

18 finding that the relevant consumers are not likely to be confused, even if several

19 *Sleekcraft* factors weigh in the plaintiff's favor. *See, e.g., Surfvivor Media, Inc. v.*

20 *Survivor Productions*, 406 F.3d 625, 635 (9th Cir. 2005).

21 ### 1.    The UNTAMED MARKS Are Weak

22         In a reverse confusion case, courts compare the conceptual strength of the

23 senior user's mark to the commercial strength of the junior user's mark. *Moose Creek,*

24 *Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1224 (C.D. Cal. 2004).

25 Conceptual strength refers to a mark's categorization on the continuum of genericness

26 to arbitrariness, while commercial strength refers to its degree of recognition in the

27 minds of the relevant customer class, often measured by the junior user's degree of

28 advertising. *Id.* Where a plaintiff's mark is conceptually weak and a defendant's mark

is commercially strong, this factor can weigh *against* a likelihood of confusion. *Id.* Even an arbitrary mark may be weak where there has been extensive third party use of similar marks on similar goods. *Matrix*, 290 F. Supp. 2d at 1091. In addition, courts are mindful not to punish a junior user who has invested heavily in a mark while the senior user has invested little. *See A & H Sportswear*, *Inc. v. Victoria's Secret Stores*, *Inc.*, 237 F.3d 198, 228 (3d Cir. 2000); *J.T. Colby & Co. v. Apple Inc.*, No. 11 CIV. 4060 DLC, 2013 WL 1903883, at *16 (S.D.N.Y. May 8, 2013) *aff'd*, No. 13-2227-CV, 2014 WL 4799139 (2d Cir. 2014) (where a senior user has invested so little that it fails to create an association in the minds of consumers there is "less reason to protect the mark").

The UNTAMED MARKS are conceptually weak because several other alcohol products, including whiskey, use the term "untamed": Ardbeg sells "Untamed Release" whiskey, Deviation sells "Backcountry Untamed Gin," Outlaw Spirits sells "Untamed" moonshine, and Toasted and Wildhaven sell "Untamed" wines. (SUF 60). Moreover, variants of the word "untamed" are frequently used to describe alcohol's character or quality. (SUF 61). In addition, prior to the BACARDI Ad Campaign, Plaintiff's alleged licensee had used only the UNTAMED *DESIGN*; had used that mark only *ornamentally* and only on *whiskey* bottles, in a manner that Lodestar's marketing expert conceded was "very small compared to everything else on the bottle" (SUF 102); and, ███████████████████████ ███████████████████████████████████ (SUF 23). Thus, there is no evidence that an appreciable number of U.S. consumers even saw the UNTAMED MARKS let alone recognized any association between the marks and their source, ████████████████████ (SUF 19).

## 2.     The Parties' Respective Uses in the Marketplace are Different

In assessing the similarity of trademarks, courts examine their sight, sound, and meaning. *Sleekcraft*, 599 F.2d at 351. "[M]arks must be considered in their entirety and *as they appear in the marketplace*," *Brookfield Commc'ns, Inc. v. W. Coast*

1   *Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999) (emphasis added), and should not

2   be dissected to compare their component parts. McCarthy § 23:41. Thus, marks are

3   routinely found dissimilar despite sharing a common word or similar spelling. *See*,

4   *e.g.*, *Groupion LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1073 (N.D. Cal. 2012);

5   *Moose Creek*, 331 F. Supp. 3d at 1227; *Stonefire Grill*, 987 F. Supp. 2d at 1052 ("a

6   common word does not render two marks similar where additional words make [them]

7   distinctive.") Moreover, the use of a "house mark" may "***reduce or eliminate***

8   likelihood of [reverse] confusion." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir.

9   2002); *see also Moose Creek*, 331 F. Supp. 2d at 1227-28. In *Petsmart*, the plaintiff

10  advertised its veterinarian clinic (Critter Clinic) as a place "Where Pets Are Family."

11  281 F.3d at 839. Petsmart later used **the *identical* slogan** to promote its pet supplies

12  stores. *Id.* The Ninth Circuit found no likelihood of confusion because, among other

13  things, both parties used the trademark "merely as a tagline to their distinctive

14  business names," which names "presented the dominant commercial identity." *Id.*

15      The UNTAMED DESIGN was used on whiskey bottles prominently branded

16  with the mark TWGS&H, which denoted the products' source. "Bacardi Untameable

17  Since 1862," which was used only as an advertising tagline and not on any products,

18  likewise featured the famous BACARDI mark. TWGS&H and BACARDI constitute

19  the dominant commercial identities and eliminate any likelihood of confusion. *Matrix*,

20  290 F. Supp. 2d at 1093 (marks were "considerably different" because "Toyota

21  MATRIX vehicles bear the TOYOTA brand name" and "MMC uses the MATRIX

22  name only with its M Logo"); *Behr Process Corp. v. RPM Int'l, Inc.*, No. CV 14-156-

23  JLS (DFMx), 2014 U.S. Dist. LEXIS 195349, *8 (C.D. Cal. Feb. 14. 2014). Because

24  the marks were not in proximity to each other in the marketplace, there could be no

25  potential for consumer confusion. This is particularly true because the UNTAMED

26  DESIGN was used only decoratively on whiskey bottles (with the word "untamed"

27  appearing inconspicuously in small font), and the UNTAMED WORD MARK was

28  used only after the launch of the BACARDI Ad Campaign as advertising copy on the

back of rum bottles, and on a small quantity of a new product created "to combat" Bacardi. (SUF 27).

Moreover, as Lodestar's linguistic expert concedes, "[y]ou don't need any analysis at all to find that [BACARDI UNTAMEABLE] is something different [from UNTAMED]."[15] (SUF 54). BACARDI UNTAMEABLE [Since 1862] contains seven syllables, with BACARDI as the first phonetic element, while UNTAMED contains only two syllables. (SUF 70). In addition, BACARDI UNTAMEABLE consists of two words and appears as "Bacardi Untameable Since 1862" alongside the BACARDI brand's bat icon. (SUF 71). In contrast, the UNTAMED WORD MARK is a single word that appears in a specific stylized font, and the UNTAMED DESIGN includes a distinct graphic illustration. (SUF 71-72.) *See Stonefire Grill*, 987 F. Supp. 2d at 1052 (finding marks distinct based on typeface and appearance); *New Milani Group, Inc. v. J.T. Bella, LLC*, No. CV 12-10612, 2013 WL 12116579, at *10; *Groupon*, 859 F. Supp. 2d at 1073-74 (finding "Groupon" and "Groupion" dissimilar when viewed as they appear in the marketplace).

Finally, the marks convey different meanings. Lodestar claims the UNTAMED MARKS tell the story of the "wild geese" (and, indeed, TWGS&H bottle labels tell that story) (SUF 2, 73), whereas BACARDI UNTAMEABLE [Since 1862] is meant to convey the "irrepressible spirit" of the Bacardi family and brand, and the liquid. (SUF 74).

### 3. The Parties' Products Are Not Similar

The standard for whether goods are "related" is whether customers are "likely to associate" the product lines. *Surfvivor*, 406 F.3d at 633. Where "there is no material

---

[15] Nonetheless, the Court should reject consideration of Plaintiff's linguistic expert on a number of bases including that the expert did not even compare the marks at issue in their entirety as they appear in the marketplace. Such expert evidence cannot prevent summary judgment to the contrary of the expert's view. *See* McCarthy's § 23:2.75. His report is also unnecessary to assist the trier of fact and likely to cause prejudice to Defendants because the similarity of two words "is a matter easily evaluated by laymen within the realm of their common knowledge and experience." *Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 398 (9th Cir. 1982).

evidence. . . that customers are likely to associate the two products or conclude that the products come from the same source," summary judgment is appropriate. *Id.* Moreover, "[m]eaningful differences" between products may negate confusion, even when the products are within the same category. *Matrix*, 290 F. Supp. 2d at 1092; *Nautilus Group*, *Inc.*, 427 F. Supp. 2d at 996 ("proximity of goods" factor favored defendant even though both products were in-home exercise equipment).

Rum and whiskey are different products with different tastes and characteristics.[16] *See Sazerac Co. v. Fetzer Vineyards*, *Inc.*, 265 F. Supp. 3d 1013, 1035 (N.D. Cal. 2017) (bourbon and wine are "very distinct products" because "[t]hey have different alcohol contents and social uses, and they occupy different sections of stores where they are offered for sale"). Rum is derived from sugarcane juice or molasses, whereas whiskey is derived from grains. (SUF 67). At retail stores, rum is typically grouped together separate from other types of spirits, including whiskey.[17] ███████████████████████████████████████████████████████ ███████ (SUF 62). In any event, given the marks' different appearances, there would be no likelihood of confusion even if the parties' product categories were the same. *See* § III.B.2; *Nautilus Group*, 427 F. Supp. 2d at 996.

### 4. There is No Evidence of Actual Confusion

Lodestar admits that it is unaware of any U.S. consumers who have been confused as to the source of its products. (SUF 55-59). This is unsurprising because Plaintiff had not sold *any* rum to U.S. consumers when Defendants launched the BACARDI Ad Campaign, and, even prior to the campaign, ███████████████ ████████████████████████████████[18] (SUF 37, 42). Where, as here, the marks

---

[16] As of November 2013, Plaintiff did not use, and had no intent to use, the UNTAMED MARKS in connection with rum in U.S. commerce. *See* §§ III.A.1, III.A.2.
[17] Defendants and/or their affiliates do not sell whiskey under the BACARDI mark. (SUF 69).
[18] Plaintiff has argued that there is evidence of consumers associating the term

allegedly co-existed for years, this weighs against a likelihood of confusion. *Petsmart*, 281 F.3d at 842 (where parties used same mark for years to market closely-related goods, "some evidence of actual confusion should have become available" if there were a likelihood of confusion); *Oculu, LLC v. Oculus VR, Inc.*, No. SACV 14-0196 DOC, 2015 WL 3619204, at *13 (C.D. Cal. June 8, 2015) (no evidence of confusion despite three-year co-existence weighed against a likelihood of confusion).

In fact, the results of a consumer survey conducted by Defendants' expert demonstrates that consumers who viewed the BACARDI Ad Campaign did not believe that Plaintiff's alleged whiskey or rum products were made by, affiliated or associated with, or received a license from the company that released the ad. (SUF 75). In sum, the consumer survey showed a net ***negative*** 4% of whiskey consumers and a net 6% percent[19] of rum consumers who made any association between the BACARDI ad and Plaintiff's alleged products. (SUF 75). These results demonstrate that BACARDI's use of "Untameable" does not cause consumer confusion as to the source of Plaintiff's alleged products.

### 5.  The Parties' Marketing Channels Are Different

The BACARDI Ad Campaign was a national campaign supported by primetime television, outdoor advertising, print, and digital/mobile executions, and the BACARDI UNTAMEABLE [Since 1862] mark was never used on product labels. (SUF 63, 100). By contrast, Plaintiff never placed any television advertisements in the U.S. and there is no evidence that it placed print advertisements in national

---

"untamed" with the BACARDI ad campaign—but even if true, such evidence is irrelevant to actual confusion, which looks to mistaken purchasing decisions. *See Walter v, Mattel, Inc.*, 31 F. Supp. 2d 751,760 (C.D. Cal. 1998). Plaintiff has offered no evidence that consumers mistakenly believed that its alleged products were associated with the BACARDI brand.
[19] Courts generally hold that likelihood of confusion survey percentages under 10% do not support a finding of likelihood of confusion. Survey Percentages in Lanham Act Matters, S. S. Diamond and J. B. Swann, *Trademark and Deceptive Advertising: Law, Science, and Design* (pp. 311-327).

magazines, outdoor advertisements, taxi tops, or bus shelters, or digital/mobile advertisements targeting U.S. consumers. (SUF 64). Rather, the UNTAMED DESIGN was used only decoratively on TWGS&H whiskey bottles and, *a year after the launch of the BACARDI Ad Campaign*, the UNTAMED WORD MARK was used as advertising copy on the back of TWGS&H rum and a *de minimus* amount of Untamed Revolutionary Rum created "to combat" Bacardi. (SUF 27, 65, 102).[20]

### 6. Consumers Exercise Care in Buying Alcoholic Beverages

Purchasers of alcoholic beverages tend to exercise a high degree of care when making their purchasing decisions. *Sazerac*, 265 F. Supp. 3d at 1037 ("Unhurried consumers in the relaxed environment of the liquor store, making decisions about $12 to $24 purchases, may be expected to exhibit sufficient sophistication to distinguish between Star's and Bacardi's products, which are differently labeled").

### 7. Defendants' Mark Was Selected in Good Faith

By definition, in a reverse confusion case, a defendant is not attempting to trade off the plaintiff's goodwill. *Novadaq Techs., Inc. v. Karl Storz GmbH & Co. K.G.*, No. 14-CV-04853-PSG, 2015 WL 9028123, at *2 (N.D. Cal. Dec. 16, 2015). In analyzing a defendant's intent, "the only relevant intent is intent to confuse." *THOIP v. Walt Disney*, 736 F. Supp. 2d 689, 713 (S.D.N.Y. 2010); *Brookfield*, 174 F.3d at 1058. Indeed, because Bacardi Limited is the largest privately held spirits company in the world (Dkt. 1), no rational inference can be drawn that Defendants needed or wanted to trick the public into associating Plaintiff's alleged products with the BACARDI brand. *M2 Software*, 421 F.3d at 1084.

In any event, there is no evidence that either the outside ad agency that came up with the "Bacardi Untameable Since 1862" concept and tagline, or the Defendants or their affiliates was even *aware* of Lodestar or its purported UNTAMED MARKS

---

[20] Moreover, the mere fact that both parties have an online presence is insufficient to show overlapping marketing channels. *Network Automation*, 638 F.3d at 1151.

1  when they selected the BACARDI UNTAMEABLE [Since 1862] mark, let alone any

2  evidence that they selected that mark with an intent to cause consumer confusion.

3  (SUF 97). *See Groupion*, 859 F. Supp. 2d at 1079 (plaintiff failed to show a genuine

4  issue of material fact as to defendant's intent where there was no evidence that

5  defendant knew of plaintiff when it selected its mark).  Moreover, while Plaintiff

6  claims that Defendants had "actual knowledge" of the UNTAMED MARKS prior to

7  *launching* the BACARDI Ad Campaign, "merely discovering Plaintiff's use [in a

8  trademark search] *is insufficient to demonstrate intent*." *Stonefire Grill*, 987 F. Supp.

9  2d at 1055; *Sazerac*, 265 F. Supp. 3d at 1036; McCarthy § 23:115

10      Finally, while Plaintiff alleges that a Bacardi representative (Enrique Comas)

11  visited Plaintiff's booth at a 2012 Berlin trade show at which it allegedly exhibited

12  the UNTAMED MARKS (Dkt. 1), there is *no* competent evidence in the record to

13  support that allegation. In fact, Lodestar has not identified a single document proving

14  Mr. Comas's purported knowledge of the UNTAMED MARKS, and Mr. Comas

15  testified that he has no recollection of visiting Plaintiff's stand at the 2012 Berlin trade

16  show, or of seeing any information at that event (or any other trade show) related to

17  TWGS&H or the UNTAMED MARKS. (SUF 78-79). Moreover, it is undisputed that

18  Mr. Comas had *no responsibility* for marketing or advertising Defendants' products,

19  *no involvement* in creating or developing the "Bacardi Untameable Since 1862"

20  campaign, and *no knowledge* of that campaign until after the final draft of the

21  television advertisement was complete. (SUF 80). Accordingly, even if *arguendo*

22  Plaintiff could establish Mr. Comas's knowledge of the UNTAMED MARKS, that

23  knowledge is insufficient as a matter of law to demonstrate an intent to cause

24  consumer confusion. *See Matrix*, 290 F. Supp. 2d at 1095 (low-level employee's

25  knowledge of plaintiff cannot be imputed to defendant because he had no involvement

26  in defendant's selection of the trademark.)

27      **8.    There is No Likelihood of Further Expansion**

28      Prior to the launch of the BACARDI Ad Campaign in the U.S., ███████

16

1 ████████████████████████████████████████████████████

2 ████████████████████████ (SUF 19, 22-24, 110). While Plaintiff claims that it recently

3 introduced rum in the U.S., courts do not consider expansion efforts after a party files

4 suit. *Groupion*, 859 F. Supp. 2d at 1077 ("Groupion cannot manufacture a likelihood

5 of confusion by expanding into Groupon's business"); *Machine Head v. Dewey*

6 *Global Holdings, Inc.*, No. C 99-04326 CW, 2001 U.S. Dist. LEXIS 22759, *12-13

7 (N.D. Cal. Dec. 13, 2001); *see also supra* § III.A.2. P███████████████████

8 ████████████████████████████████████████████████████

9 (SUF 27) does not create a genuine issue as to the likelihood of expansion.

## IV. EVEN IF LODESTAR COULD ESTABLISH LIABILITY, IT IS NOT ENTITLED TO MONETARY RELIEF AS A MATTER OF LAW

12      Monetary relief under the Lanham Act is "subject to the principles of equity,"

13 15 U.S.C. § 1117(a), meaning that it "should not be granted as a matter of right."

14 *Oculu*, 2015 WL 3619204, at *20. Here, Lodestar seeks a disgorgement of

15 Defendants' profits, actual damages, punitive damages, treble damages, and

16 attorneys' fees. (Dkt. 1). All of these claims should dismissed as a matter of law.

### A.     LODESTAR IS NOT ENTITLED TO A DISGORGEMENT OR ATTORNEYS' FEES

19      Under the Lanham Act, a disgorgement "is proper only where the defendant is

20 attempting to gain the value of an established name of another." *Hydramedia Corp.*

21 *v. Hydra Media Grp. Inc.*, 392 F. App'x 522, 523 (9th Cir. 2010). In reverse confusion

22 cases, a disgorgement of the infringer's profits is impermissible. *Novadaq*, 2015 WL

23 9028123, at *2. As this Court has explained, "[d]isgorging the infringer's significant

24 profits without proof of trading off the mark holder's goodwill would. . . amount to a

25 penalty to the infringer and a windfall to the trademark holder, who has only a

26 relatively obscure name to appropriate, even if the infringer's conduct was otherwise

27 intentional." *Master, Ltd. v. Zobmondo Entertainment, LLC*, 944 F. Supp. 2d 830,

28 848-49 (C.D. Cal. 2012); *see also Scat Enterprises, Inc. v. FCA US LLC*, No. CV 14-

1   7995-R, 2017 WL 5896182, at *2 (C.D. Cal. June 8, 2017) ("The relevant case law

2   of this Circuit is clear—Plaintiff is not entitled to seek disgorgement under its reverse

3   confusion theory"). Because Lodestar alleges reverse trademark confusion, summary

4   judgment on its disgorgement claim is appropriate. *See Hydramedia*, 392 F. App'x at

5   523; *Scat*, 2017 WL 5896182, at *2; *Novadaq*, 2015 WL 9028123, at *2.

6       Lodestar's disgorgement claim fails for the additional reason that Lodestar

7   cannot establish willfulness—which also precludes attorneys' fees. Where, as here, a

8   plaintiff seeks the defendant's profits based on a theory of disgorgement, "willful

9   infringement is a prerequisite." *Adray v. Adry-Mart, Inc*., 76 F.3d 984, 988 (9th Cir.

10  1995). Likewise, attorneys' fees are recoverable only in "exceptional" cases—

11  namely, when the infringement is "malicious, fraudulent, deliberate or willful." *M2*

12  *Software Inc. v. Viacom Inc*., 223 F. App'x 653, 656 (9th Cir. 2007); 15 U.S.C. §

13  1117(a). Willful infringement requires a "deliberate intent to deceive," and courts

14  apply "forceful labels" like "'false,' 'misleading,' or 'fraudulent' to conduct that

15  meets this standard." *Pogrebnoy v. Russian Newspaper Distribution, Inc*., 289 F.

16  Supp. 3d 1061, 1072 (C.D. Cal. 2017), *aff'd*, 742 F. App'x 291 (9th Cir. 2018).

17      Lodestar's claim for willful infringement rests on its allegations that Defendants

18  had "actual knowledge" of the UNTAMED MARKS as of 2012, and "copied [their]

19  entire ad campaign from Lodestar's pre-existing. . . campaign." (SUF 76). These

20  allegations are not only unsupported and contradicted by the record, but are also

21  insufficient as a matter of law to support the relief that Lodestar seeks.

22      There is no competent evidence from which a reasonable factfinder could

23  conclude that, as of November 2012, when Defendants' outside ad agency created the

24  "Bacardi Untameable Since 1862" tagline, either Defendants or their ad agency were

25  even *aware* of the UNTAMED MARKS, Lodestar, Avalon, Protégé, or their

26  products—let alone any evidence that Defendants' deliberately copied Plaintiff's ad

27  campaign. (SUF 97). Moreover, as explained above, even if Lodestar could

28  demonstrate Defendants' "actual knowledge" of the UNTAMED MARKS prior to

18

the launch of the BACARDI Ad Campaign, knowledge alone is insufficient to establish willfulness as a matter of law. *See supra* § III.B.7; *see also Stonefire Grill*, 987 F. Supp. 2d at 1055-56; *Color Me Mine Enterprises Inc. v. S. States Mktg. Inc.*, No. CV1200860RGKJCX, 2013 WL 12119715, at *10 (C.D. Cal. Apr. 25, 2013).

Finally, in determining whether attorneys' fees are appropriate, courts examine the "totality of the circumstances," including "frivolousness, motivation, objective unreasonableness" and the need for "compensation and deterrence." *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1181 (9th Cir. 2016). Thus, even a finding of willfulness is "insufficient on its own to support an award of fees in the absence of some aggravating circumstance or heightened level of culpability." *Anhing Corp. v. Thuan Phong Co. Ltd.*, No. CV1305167BROMANX, 2016 WL 6661178, at *3 (C.D. Cal. Jan. 25, 2016). Because Lodestar has failed to offer any evidence of willful infringement—let alone any evidence of "aggravating circumstances" or a "heightened level of culpability"—its claims for attorneys' fees and for a disgorgement of Defendants' profits fail as a matter of law.[21]

## B.   LODESTAR IS NOT ENTITLED TO ACTUAL DAMAGES

A likelihood of confusion is insufficient to warrant the recovery of actual damages under the Lanham Act. Rather, "[a] plaintiff must prove both the fact and the amount of damage" with "reasonable certainty." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993) (abrogated on other grounds). Lodestar cannot meet this burden.

---

[21] Lodestar's inability to prove willfulness also precludes **punitive damages**, to the extent Lodestar seeks such damages pursuant to California common law. *See* Cal. Civ. Code § 3294. Moreover even a finding of willfulness would not entitle Lodestar to punitive damages under the Lanham Act or California Business & Professional Code § 17200, which preclude punitive damages as a matter of law. *Groupion*, 859 F. Supp. 2d at 1083. To the extent Lodestar's claim for **treble damages** rests on Defendants' alleged willfulness, that claim also must fail. In any event, treble damages are permitted only as a form of "compensation, and not as a penalty." 17 U.S.C. § 1117(a). Because Lodestar cannot establish an entitlement to actual damages, it is not entitled to a trebling of those damages as a matter of law.

### 1. There is No Evidence that Lodestar Suffered an Injury

To establish that Lodestar suffered an "injury to its goodwill" as a result of Defendants' alleged infringement, Lodestar must prove that: (1) the UNTAMED MARKS possessed value prior to Defendants' alleged infringement; (2) the UNTAMED MARKS *lost* value following Defendants' alleged infringement; (3) Defendants' alleged infringement *caused* that loss; and (4) as a result, Lodestar suffered an injury. Lodestar cannot establish any of these facts.

As of November 2013, Lodestar had *never* utilized the UNTAMED WORD MARK in U.S. commerce for any products, and had used the UNTAMED DESIGN only on whiskey bottles that were otherwise prominently labeled with TWGS&H brand name. (SUF 26, 101-102). Thus, while Lodestar has produced data suggesting that, prior to November 2013, Avalon had sold whiskey to U.S. distributors, there is no evidence that those sales arose from, or can be attributed to, the UNTAMED MARKS.

Unable to rely on Avalon's sales to prove goodwill, Lodestar's proffered damages expert, Dr. Barbara C. Luna, instead relies on the fact that Lodestar allegedly ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ (SUF 103). ████████████████████ ████████████████████████████████████████████████ (SUF 104-105).[22] In any event, the question is not whether Lodestar *expected* the marks to garner goodwill, but whether they *actually* possessed goodwill at the time of the alleged infringement. Dr. Luna's reliance on *Defendants'* advertising expenditures to

---

[22] Dr. Luna's assertion is based solely on invoices directed to *Avalon*. There is no evidence that those invoices were *ever* paid, let alone that they were paid by Lodestar. (SUF 105). Moreover, Mr. Levy testified ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ (SUF 106).

1   demonstrate the value of the UNTAMED MARKS is also improper. Dr. Luna

2   illogically claims that ███████████████████████████████████████

3   ████████████████████████████████████████████████████████████

4   ██████████████████████████████ (SUF 107-108). There is no legal or

5   logical support for that position.

6        In any event, even if Lodestar could demonstrate that the UNTAMED MARKS

7   possessed value, it cannot demonstrate any *loss* in value as a result of Defendants'

8   alleged infringement because: (1) Mr. Levy acknowledged that there is no evidence

9   of actual confusion; (2) ███████████████████████████████████████

10  ██████ and (3) █████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  ████████████████████████████ (SUF 19, 23, 24, 109, 110). ████

13  ████████████████████████████████████████████████████ (SUF

14  110).

15       Moreover, while Dr. Luna's opinion purports to *calculate* Lodestar's alleged

16  damages, Dr. Luna does not even identify the injury that her calculations purport to

17  measure. *See Computer Access Tech. Corp. v. Catalyst Enterprises, Inc.*, 273 F. Supp.

18  2d 1063, 1074 (N.D. Cal. 2003) (insufficient evidence to support damages where

19  expert never stated that his calculations "arose from the trademark claim"). In fact,

20  Dr. Luna repeatedly testified █████████████████████████████████

21  ██████████████████████████████████████████████████ (SUF 111).

22       In *American Automobile*, the court granted summary judgment on the issue of

23  actual damages because "none of [the plaintiff's] written responses or documents

24  identif[ied] any actual damages"; "[the plaintiff's] witnesses testified that they were

25  unaware of any specific instances of" consumer confusion; and the plaintiff's

26  damages expert "could not identify any evidence of actual damages." 2019 WL

27  1304309, at *23. Here too, Lodestar has not identified any actual damage; Mr. Levy

28  testified ████████████████████████████████████████████; and Dr.

1    Luna did not even attempt to identify any evidence of actual damages.

2          Finally, even if Lodestar could prove that the UNTAMED MARKS lost value,

3    there is no evidence that *Lodestar* suffered that loss. In *Blau v YMI Jeanswear, Inc.*,

4    the Court denied actual damages, holding that, because the plaintiff, which had

5    licensed its trademark to a third party, received a fixed salary from the licensee, there

6    was no evidence that his "personal income decreased due to Defendants' alleged

7    infringement." No. CV 02 09551 FMC SHSX, 2004 WL 5313967, at *3 (C.D. Cal.

8    Jan. 2, 2004), *aff'd*, 129 F. App'x 385 (9th Cir. 2005). *Id.* Here, at the time of the

9    alleged infringement, Avalon allegedly held an exclusive license to the UNTAMED

10   MARKS ██████████████████████. (SUF 112). ████████████

11   ████████████████████████████████, it cannot demonstrate

12   that it suffered any loss as a result of Defendants' alleged infringement.

13              **2.      Lodestar Fails to Prove the Amount of Damages**

14         Actual damages under the Lanham Act must be proven with "reasonable

15   certainty," and while "[d]amages are not rendered uncertain because they cannot be

16   calculated with absolute exactness. . . a reasonable basis for computation must exist."

17   *Lindy Pen*, 982 F.2d at 1407. Thus, "[m]any courts have denied a monetary award in

18   infringement cases when damages are remote and speculative." *Id.* at 1408. Lodestar

19   seeks damages in the form of either reasonable royalties or corrective advertising.

20   (SUF 77). As explained below, these calculations are entirely speculative, and bear

21   no relationship to the loss that Lodestar alleges to have suffered. Thus, even if

22   Lodestar could establish that it suffered an injury, its damages claims fails.

23            **a.   Lodestar is Not Entitled to Corrective Advertising Damages**

24         Corrective advertising  "is intended to make the plaintiff whole" by "allowing

25   the plaintiff to recover the cost of advertising undertaken to restore the value

26   plaintiff's trademark has lost due to defendant's infringement." *Int'l Oddities v.*

27   *Record*, No. CV 12-3934-CAS VBKX, 2013 WL 3864050, at *14 (C.D. Cal. July 22,

28   2013) (J. Snyder). Thus, corrective advertising "must be tied to 'non-speculative

evidence' that the goodwill associated with the plaintiff's mark has actually been diminished by the defendant's conduct." *Id.* While "uncertainty as to the *amount* of damages is not fatal," the plaintiff still must prove "the foundational *fact* that its mark lost value at all." *Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF HRL, 2011 WL 2749576, at *6 (N.D. Cal. July 14, 2011). A corrective advertising award will be denied if it is "not sufficiently tethered to correcting the nature of the harm suffered" by the plaintiff. *See, e.g.*, *Binder v. Disability Group, Inc*., 772 F. Supp. 2d 1172, 1181 (C.D. Cal. 2011) (denying corrective advertising because while people "had negative opinions of Plaintiffs as a result of Defendants' acts, . . . there [was] no reasonable way to ascertain their existence and to target or include them in a corrective advertising campaign"). Here, there is no evidence that the UNTAMED MARKS ever possessed any goodwill, let alone that their goodwill was *actually diminished* by Defendant's conduct. Without proving the goodwill that Lodestar allegedly lost, it is impossible to fashion a non-speculative corrective advertising award.

### b. Lodestar is Not Entitled to Reasonable Royalties

"Reasonable royalties are a calculation of the hypothetical licensing royalties that an infringer would have paid to the senior owner of a mark[.]" *QS Wholesale, Inc. v. World Mktg., Inc.*, No. SA 12-CV-0451 RNBX, 2013 WL 1953719, at *4 (C.D. Cal. May 9, 2013). Because reasonable royalties "are a form of damages for lost profits," they must be proven "with reasonable certainty as to both occurrence and extent." *Quia*, 2011 WL 2749576, at *6. Thus, the plaintiff must demonstrate both the *fact* that royalty fees were lost, *and* the amount of that loss. *Tokidoki, LLC v. Fortune Dynamic, Inc*., No. CV 07-1923DSF(PJWX), 2009 WL 2366439, at *14 (C.D. Cal. July 28, 2009). Because of the "reasonable certainty" requirement, reasonable royalties are most often awarded "where the parties had a prior licensing arrangement" or "the plaintiff previously had engaged in the practice of licensing the mark to a third-party." *Quia*, 2011 WL 2749576, at *6. Absent such evidence a plaintiff may recover reasonable royalties only if it demonstrates "a legitimate

proposed basis on which to calculate" royalties. *M2 Software*, 223 F. App'x at 655.

Here, there is no legitimate basis on which to calculate reasonable royalties because: (1) the parties do not have any prior licensing arrangements or negotiations; (2) Lodestar has never licensed the UNTAMED MARKS to an unaffiliated party; and (3) there is no evidence that Defendants have ever entered into a trademark license in connection with the advertising or sale of their products. (SUF 114).  And, even if there were a legitimate basis on which to calculate a royalty *rate*, there is no evidence "that royalties were lost." *Tokidoki*, 2009 WL 2366439, at *14; *see also Computer Access*, 273 F. Supp. 2d at 1077 (denying reasonable royalties because there was "no evidence on the number of 'lost sales'. . . available to multiple by any 'licensing fee'"); *Color Me Mine*, 2013 WL 12119715, at *9 (denying "lost licensing fees" because plaintiff could not establish that it "lost out on licensing fee revenue"); *Sands, Taylor & Wood v. Quaker Oats* Co., 34 F.3d 1340, 1345 (7th Cir. 1994) (applying hypothetical royalty rate to "[Defendant's] sales, minus preinfringement sales levels"). [23] Because Lodestar has not established the portion of Defendants' revenues attributable to the BACARDI Ad Campaign (███████████████████████████████ ████████████████████████), there is no basis on which to claim that Lodestar "lost out" on royalties. (SUF 109).  Any reasonable royalty award would therefore be impermissibly speculative. *See Quia*, 2011 WL 2749576, at *6.

### C.   LODESTAR IS NOT ENTITLED TO MONETARY RELIEF UNDER CALIFORNIA LAW

Under California common law, damages for unfair competition are available

---

[23] The *Sands* court awarded reasonable royalties where the parties' marks were *identical*.  Moreover, the *Sands* court considered a hypothetical negotiation with the *exclusive licensor*, instead of the trademark owner. 34 F.3d at 1345 n.4. Here, Avalon allegedly held an exclusive license to the UNTAMED MARKS under an agreement that did not entitle Lodestar to royalties. (SUF 112). Thus, a hypothetical negotiation would not even result in any monetary recovery by Lodestar.

only upon a showing of "fraud or an intent to mislead consumers," neither of which Lodestar has even alleged. *See Los Defensores, Inc. v. Gomez*, 223 Cal. App. 4th 377, 393, 166 Cal. Rptr. 3d 899, 912 (2014).[24] Under California Business & Professional Code § 17200, monetary relief is limited to restitution—*i.e.*, the return of money to those "from whom the property was take." *Id.* at 1082. Thus, a disgorgement is allowed only to the extent "the disgorged money or property [came] from the. . . plaintiff in the first instance[.]" *Glob. Apogee v. Sugarfina, Inc.*, No. CV 18-5162-RSWL-E, 2018 WL 4945305, at *6 (C.D. Cal. Oct. 10, 2018). Where the plaintiff seeks "funds [that] were redirected to Defendant and never received by Plaintiff," recovery is not permitted. *Id.* at *6. Lodestar does not claim restitution, nor can it recast its disgorgement claim as one for restitution because Defendants' profits came from customers, not Lodestar. *See Hush Hush Sound, Inc. v. H & M Hennes & Mauritz LP*, No. 2:17-CV-07668-RGK-SS, 2018 WL 4962086, at *7 (C.D. Cal. Jan. 26, 2018) (denying restitution because revenues were received from customers, not plaintiffs.) Thus, to the extent Lodestar seeks monetary damages under its state law claims, those claims should be dismissed.

## V.   <u>CONCLUSION</u>

For the reasons stated above, Defendants respectfully requests that the Court grant this Motion for Summary Judgment in its entirety.

DATED: May 13, 2019

Respectfully submitted,
KELLEY DRYE & WARREN LLP
Michael C. Lynch (*pro hac vice*)


By:   /s/ Michael C. Lynch
Michael C. Lynch
Attorneys for Bacardi & Company
Limited, Bacardi U.S.A., Inc. and
Bacardi Limited

---

[24] In any event, common law unfair competition is limited to where a party "passes of their goods as another." *Groupion*, 859 F. Supp. 2d at 1083. Because Lodestar has not alleged "passing off," its common law claim fails as a matter of law.