KELLEY DRYE & WARREN LLP
    Tahir L. Boykins (State Bar No. 323441)
    tboykins@kelleydrye.com
10100 Santa Monica Boulevard
Los Angeles, CA 90067-4008
Telephone:  (310) 712-6100
Facsimile:  (310) 712-6199

KELLEY DRYE & WARREN LLP
    Michael C. Lynch (*pro hac vice*)
    mlynch@kelleydrye.com
    Andrea L. Calvaruso (*pro hac vice*)
    acalvaruso@kelleydrye.com
101 Park Avenue
New York, NY 10178
Telephone:   (212) 808-7800
Facsimile:    (212) 808-7897

Attorneys for Bacardi & Company Limited,
Bacardi U.S.A., Inc. and Bacardi Limited

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| LODESTAR ANSTALT, a Liechtenstein company, | Case No.  2:16-cv-06411-CAS-FFMx |
| Plaintiff, | **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | Date:  June 17, 2019<br>Time:  10:00 a.m. |
| BACARDI & COMPANY LIMITED, a Liechtenstein company, BACARDI U.S.A., Inc., a Delaware corporation, and BACARDI LIMITED, a Bermuda company, | Judge:  Hon. Cristina A. Snyder<br>Place:  Courtroom 8D |
| Defendants. | **REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL** |
| AND RELATED COUNTERCLAIMS. | |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................ 1

II.    SUMMARY JUDGMENT OF ALL CLAIMS IS WARRANTED ............ 2

    A.   PLAINTIFF MADE NO BONA FIDE USE OF THE UNTAMED MARKS BEFORE THE BACARDI AD CAMPAIGN ........................................................................ 2

    B.   THERE IS NO LIKELIHOOD OF CONFUSION ........................... 9

        1.   The UNTAMED WORD MARK Is Weak ............................. 9

        2.   The Parties' Respective Uses in the Marketplace are Different ......................................................................10

        3.   The Parties' Products Are Not Similar ...................................14

        4.   There is No Evidence of Actual Confusion ...........................14

        5.   The Parties' Marketing Channels Are Different ....................15

        6.   Consumers Exercise Care in Buying Alcoholic Beverages ....16

        7.   Defendants' Mark Was Selected in Good Faith......................16

        8.   There is No Likelihood of Further Expansion .......................17

III.   LODESTAR IS NOT ENTITLED TO MONETARY RELIEF.................17

    A.   LODESTAR CANNOT ESTABLISH THAT IT SUFFERED AN INJURY AS A RESULT OF DEFENDANTS' ALLEGED INFRINGEMENT ........................................................................17

    B.   LODESTAR IS NOT ENTITLED TO REASONABLE ROYALTIES ........................................................................18

        1.   Lodestar Cannot Demonstrate a Reliable Basis on Which to Calculate a Reasonable Royalty Rate ..................................18

        2.   Lodestar Cannot Establish That Any Portion of Defendants' Sales Was Attributable to the Alleged Infringement ........................................................................21

    C.   LODESTAR IS NOT ENTITLED TO CORRECTIVE ADVERTISING DAMAGES BECAUSE IT CANNOT ESTABLISH THAT THE GOODWILL ASSOCIATED WITH THE UNTAMED MARKS WAS "ACTUALLY DIMINISHED" BY DEFENDANTS' CONDUCT....................................................22

    D.   LODESTAR IS NOT ENTITLED TO ATTORNEYS FEES BECAUSE IT CANNOT DEMONSTRATE THAT THIS CASE IS "EXCEPTIONAL"........................................................................24

IV.    CONCLUSION ........................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Paging, Inc. v. Am. Mobilphone, Inc.*,
   13 U.S.P.Q.2D (BNA) 2036 (T.T.A.B. Nov. 15, 1989)........................................6

*Adidas America, Inc. v. Payless Shoesource, Inc.*,
   No. CV 01-1655-KI, 2008 WL 429812 (D. Ore. Sept. 12, 2008) .....................19

*Americana Trading, Inc. v. Russ Berrie & Co.*,
   966 F.2d 1284 (9th Cir. 1992)..........................................................................13

*Anderson v. Jackson*,
   No. CV 04-2649 CAS, 2006 U.S. Dist. LEXIS 103218 (C.D. Cal.
   Aug. 30, 2006) (J. Snyder) .................................................................................4

*Anhing Corp. v. Thuan Phong Co. Ltd.*,
   No. CV1305167BROMANX, 2016 WL 6661178 (C.D. Cal. Jan. 25,
   2016) .................................................................................................................24

*Bauer Bros., LLC v. Nike, Inc.*,
   159 F. Supp. 3d 1202 (S.D. Cal. 2016) ............................................................18

*Behr Process Corp. v. RPM Int'l, Inc.*,
   2014 U.S. Dist. LEXIS 195349 (C.D. Cal. Feb. 14. 2014) ...............................13

*Bellagio Jewelry, Inc. v. Croton Watch Co.*,
   2008 U.S. Dist. LEXIS 130262 (C.D. Cal. Aug. 19, 2008) .......................16, 25

*Blau v. YMI Jeaswear, Inc.*,
   No. CV 02 09551 FMC SHSX, 2004 WL 5313967, at *3 (C.D. Cal.
   Jan. 2, 2004) .....................................................................................................19

*Chance v. Pac-Tel Teletrac Inc.*,
   242 F.3d 1151 (9th Cir. 2001)............................................................................4

*Cohn v. Petsmart, Inc.*,
   281 F.3d 837 (9th Cir. 2002)........................................................................9, 13

*Color me Mine Enters. Inc. v. S. States Mktg. Inc.*, No. CV 12-00860
   RGK-(JCx), 2013 WL 12119715 (C.D. Cal. Apr. 25, 2013) ...........................22

*Computer Access Tech. Corp. v. Catallyst Enters., Inc.*,
   273 F. Supp. 2d 1063 (N.D. Cal. 2002)............................................................22

*Core Nutritionals, LLC v. Performance Nutrition Formulators, LLC*,
   No 16-CV-705 TJH, 2016 WL 9088702 (C.D. Cal. Sept. 28, 2016) ................10

*Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*,
   448 F.3d 1118 (9th Cir. 2006)............................................................................3

*Dragon Bleu (SARL) v. VENM, LLC*,
   112 U.S.P.Q.2d 1925 (T.T.A.B. 2014) ...................................................8

*Glow Indus., Inc. v. Lopez*,
   252 F. Supp. 2d 962 (C.D. Cal. 2002) ....................................................9

*Grant Time Corp. v. Watch Factory Corp.*,
   2011 WL 2412960 (N.D. Tex. June 10, 2011) .......................................5

*Kleven v. Hereford*,
   No. CV 13-02783-AB, 2015 U.S. Dist. LEXIS 111185 (C.D. Cal. Aug. 21, 2015) ........................................................................................7

*Lindy Pen Co. v. Bic Pen Corp.*,
   982 F.2d 1400 (9th Cir. 1993) (abrogated on other grounds).............17

*M2 Software, Inc. v. Madacy Ent.*,
   421 F.3d 1073 (9th Cir. 2005)................................................................9

*M2 Software Inc. v. Viacom Inc.*,
   223 F. App'x 654 (9th Cir. 2007) ...................................................17, 24

*Man Mach. Interface Techs., LLC v. Vizio, Inc.*,
   No. SACV100634AGMLGX, 2012 WL 13014967 (C.D. Cal. Feb. 27, 2012)................................................................................................21

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
   331 F. Supp. 2d 1214 (C.D. Cal. 2004) ...............................................13

*Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*,
   57 F. Supp. 3d 1203 (C.D. Cal. 2014) ...................................................6

*Patron Spirits Int'l v. Peter W. Noyes*,
   2016 WL 7010641 (T.T.A.B. 2016) .....................................................10

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
   213 F. Supp. 2d 1146 (C.D. Cal. 2002) ...............................................10

*Powermatics, Inc. v. Globe Roofing Products Co.*,
   52 C.C.P.A. 950 (1965) .........................................................................3

*Pro-Cuts v. Schilz-Price Enters.*,
   27 U.S.P.Q.2D (BNA) 1224 (T.T.A.B. June 1, 1993) ...........................6

*QS Wholesale, Inc. v. World Mktg., Inc.*,
   No. SA 12-CV-0451 RNBX, 2013 WL 1953719, at *5 (C.D. Cal. May 9, 2013) .........................................................................................19

*Quia Corp. v. Mattel, Inc.*,
   No. C 10-1902 JF HRL, 2011 WL 2749576 (N.D. Cal. July 14, 2011)...................................................................................................23

*Sands, Taylor & Wood v. Quaker Oats Co.*,
   34 F.3d 1340 (7th Cir. 1994)....................................................18, 21, 22

iii

*In re Siny Corp.*,
   920 F.3d 1331 (Fed. Cir. 2019) ........................................................................4

*TAO Licensing, LLC v. Bender Consulting Ltd.*,
   125 U.S.P.Q.2d 1043, 2017 WL 6336243 (T.T.A.B. 2017) ...............................5

*Teal Bay Alls., LLC v. Southbound One, Inc.*,
   No. MJG-13-2180, 2015 U.S. Dist. LEXIS 10940 (D. Md. Jan. 26,
   2015) ................................................................................................................7

*Tokidoki, LLC v. Fortune Dynamic, Inc.*,
   No. CV 07-1923DSF(PJWX), 2009 WL 2366439 (C.D. Cal. July
   28, 2009) ...........................................................................................................22

*United States v. Mongol Nation*,
   370 F. Supp. 3d 1090 (C.D. Cal. 2019) ...........................................................23

*Walter v. Mattel, Inc.*,
   31 F. Supp. 2d 751 (C.D. Cal. 1998) ...............................................................15

*ZAZU Designs v. L'Oreal S.A.*,
   979 F.2d 499 (7th Cir. 1992) .............................................................................5

*Zobmondo Entm't, LLC v. Falls Media, LLC*,
   602 F.3d 1108 (9th Cir. 2010) .........................................................................10

**Statutes**

27 U.S.C. § 205(e) ...............................................................................................4, 5

Fed. R. Evid. 901 ...................................................................................................10

# I.     **INTRODUCTION**

A review of the undisputed evidence makes clear that Defendants' motion for summary judgment should be granted. Plaintiff has not proffered evidence sufficient to support its claims. The majority of its allegations rely solely on unsupported, self-interested declarations of its Chairman, Andre Levy. This is insufficient to avoid summary judgment. ***First,*** Plaintiff must prove it owns prior rights in the mark it claims was infringed. Plaintiff has withdrawn its claim for infringement of the UNTAMED *DESIGN* and now claims only infringement of the stylized UNTAMED *WORD* MARK. Since it cannot prove use of the UNTAMED WORD MARK in U.S. commerce until after Defendants' alleged infringing ad campaign, Plaintiff asks this Court to find that its use of the UNTAMED *DESIGN* supports the prior trademark rights necessary to allege infringement of the entirely different UNTAMED *WORD* MARK. In sum, Plaintiff asks this Court to consider the UNTAMED DESIGN to support its prior trademark rights, yet ignore it with respect to the likelihood of confusion analysis because the UNTAMED DESIGN is so clearly different in appearance from the BACARDI UNTAMEABLE SINCE 1862 tagline. There is no basis for this in the law.

Plaintiff relies heavily upon its trademark registration for the UNTAMED WORD MARK, claiming that once issued, its "constructive use date" confers rights that are absolute unless proven "abandoned" by clear and convincing evidence. Plaintiff ignores that this registration, which was issued based upon a foreign registration without proof of use, provides only a *rebuttable* presumption of its rights in the mark. Here, Defendants have rebutted this presumption by demonstrating that Plaintiff *had not commenced bona fide* trademark use of the UNTAMED WORD MARK in U.S. commerce necessary to sustain the trademark registration prior to the first use of the tagline BACARDI UNTAMEABLE SINCE 1862. Prior to the launch of the BACARDI Ad Campaign, the only product sold in the U.S. was WILD GEESE branded whiskey, which bore the UNTAMED *DESIGN* in an ornamental fashion on

bottles.[1] Even if such use constituted *bona fide* trademark use of UNTAMED DESIGN, it does *not* confer Plaintiff with the necessary trademark rights in the UNTAMED *WORD* MARK prior to use of the BACARDI Ad Campaign because the UNTAMED WORD MARK is materially different from the UNTAMED DESIGN and was only used *after* the Defendants' alleged infringement. Given that Plaintiff *did not even commence bona fide* trademark use of the UNTAMED WORD MARK prior to Defendants' alleged infringement, an analysis as to whether it *later abandoned* the mark is not even necessary.[2] ***Second***, even if Plaintiff could demonstrate prior rights in the UNTAMED WORD MARK, there is no evidence that Plaintiff's customers were likely to be confused into believing that its products were associated with the BACARDI Ad Campaign or BACARDI branded products. A comparison of the way consumers actually encountered the BACARDI Ad Campaign, and Plaintiff's alleged products makes clear that no rational juror could find a likelihood of confusion. A properly designed survey conducted by Defendants' expert using appropriate stimuli that reflected market realities confirms the same. ***Finally***, even if there were a likelihood of confusion, there is no evidence in the record that Lodestar suffered any injury or that Defendants' alleged infringement was willful.

## II. SUMMARY JUDGMENT OF ALL CLAIMS IS WARRANTED

### A. PLAINTIFF MADE NO *BONA FIDE* USE OF THE UNTAMED MARKS BEFORE THE BACARDI AD CAMPAIGN

As set forth in Defendants' opening brief, Plaintiff never made *bona fide* use of the UNTAMED MARKS in U.S. commerce before the launch of the BACARDI Ad Campaign.[3] ***First***, Lodestar does not cite to *any evidence* of its own *bona fide*

---

[1] Plaintiff's lack of use is evident because it submitted images of the UNTAMED *DESIGN* to the USPTO, not use of the UNTAMED *WORD* MARK to maintain its registration. The USPTO's erroneous acceptance of this specimen of use, which does not even include "Untamed" in the same stylization as registered, is not binding on the issue of *bona fide* use of the UNTAMED WORD MARK in commerce.
[2] Nevertheless, Defendants argue abandonment in the alternative.
[3] Plaintiff deliberately uses misleading terms to refer to its Wild Geese branded

trademark use in U.S. commerce that would preclude summary judgment. Rather, it cites alleged "use" by third-party Avalon, but Lodestar submits no evidence sufficient to prove that it had a valid license with Avalon for use of the UNTAMED MARKS. As such, any sale of the Wild Geese and Untamed Revolutionary Rum products in the U.S. by Avalon cannot be deemed to inure to the benefit of Lodestar, and cannot support its trademark rights or registrations. *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1130 (9th Cir. 2006); McCarthy § 18:45.50.

**Second**, even if there were a valid license, none of the activity described in Plaintiff's brief constitutes *bona fide* trademark use of the UNTAMED *WORD* MARK in U.S. commerce prior to the launch of the BACARDI Ad Campaign in November 2013, or the date of presumptive abandonment on October 4, 2014, even when viewed in the "totality of the circumstances."

| Plaintiff's Alleged Use | |
|---|---|
| • **April 2009**: Over 1500 cases of Wild Geese branded whiskey are "sold into" the U.S.<br><br>• **January 2010**: Over 2100 cases of Wild Geese branded whiskey are "sold into" the U.S. | UNTAMED *WORD* MARK has never appeared on any bottle of whiskey sold by Plaintiff in the U.S. (Def. SUF 49, 101). Merely importing product does not constitute *bona fide* use in commerce because here there is no evidence that, as of that date, the products were available for sale in the U.S. (Dkt. 299 at 7:9-12). |
| • **September/October 2012**: Lodestar publishes ads in Moodie Report and TR Business advertising Lodestar's Wild Geese branded rum. | Mere advertisements do not constitute use in commerce and there is no evidence that U.S. consumers even *saw* the ads because TR Business and Moodie Report are *international trade* publications, not consumer-facing publications. *See Powermatics, Inc. v. Globe Roofing* |

products (such as UNTAMED Premium Rum and UNTAMED Golden Rum to refer to the WILD GEESE branded rums), and improperly highlights portions of product labels, in an attempt to distract the Court from the fact that it never branded product with any UNTAMED WORD MARK until after the launch of the BACARDI Ad Campaign, and never sold any products to distributors for U.S. sale until after the presumptive abandonment expired. **All of the evidence in the record** shows the products are: THE WILD GEESE SOLDIERS & HEROES Premium Rum and THE WILD GEESE SOLDIERS & HEROES Golden Rum and that these products did not display UNTAMED in a predominant manner on the labels. Even Plaintiff's "Chairman" ████████████████████████████████████████ (*See, e.g.,* Lynch Reply Decl., Ex. 1 at 130:1-3, 146:23-25, 155:1-2, 481:19-24; *see also* Dkt. 300-2, Ex. F).

| | |
|---|---|
| | *Products Co.*, 52 C.C.P.A. 950, 954 (1965); McCarthy § 16:29. (Dkt. 299 at 6:7-10, n.4). |
| • **October 9-10, 2012**: Lodestar alleges it advertises, promotes, and sells its Wild Geese branded rum products at the Bar Convent Berlin. | Use in Germany is irrelevant to demonstrate use in U.S. commerce. There is also no record of sales at the industry-facing event and mere advertisements do not constitute use in commerce. (Dkt. 299 at 6:7-10, n4). |
| • **February 14, 2013-March 1, 2013**: U.S. Alcohol and Tobacco Tax and Trade Bureau (TTB) issues and approves certificate of label application (COLA) for Lodestar's Wild Geese Premium Rum and Wild Geese Golden Rum for U.S. | There is no evidence that, as of this date, the labels were affixed to products that were available for sale in the U.S. In fact, it is not possible to legally sell alcoholic beverages in the U.S. until after the labels are approved. *See* 27 U.S.C. § 205(e). |
| • **April 15-21, 2013**: Lodestar provides rum tasting of Wild Geese branded rum and seeks U.S. distributors at the Rum Renaissance Trade Show in Miami, FL.[4] | Mere advertisements do not constitute use in commerce and there is no evidence that Plaintiff took any purchase orders at the purported trade show. *In re Siny Corp.*, 920 F.3d 1331, 1336 (Fed. Cir. 2019); TMEP § 904.04(b). Merely "exposing products" to consumers and displaying them does not constitute *bona fide* use in commerce where the products were not available for sale.[5] *See* Exhibit H to Mr. Levy's declaration in opposition to Defendants' motion makes clear Plaintiff was not even close to selecting distributors *to solicit* to sell the rum product in the U.S. as of April 22, 2013. Two months later, Lodestar affirmatively decided not to sell rum in the U.S. market.[6] (Dkt. 299 at 1:16-21). |

---

[4] Plaintiff's contention that "Bacardi representatives, including Facundo Bacardi, attended the show" is false. (*See* Evid. Obj. No. 26).

[5] *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151 (9th Cir. 2001), is not to the contrary. There, the court held the plaintiff could not establish priority of use based on a national post card advertising mailer because "[w]hile the mailing may have been some evidence of a commercial intent when it was mailed" the plaintiff failed to establish that it "genuinely continued to exploit the mark." *Id.* at 1160.

[6] In the face of documentary evidence, Lodestar weakly submits the unsupported, self-interested, years-after-the-fact declaration of its own Chairman, Mr. Levy, who states that he "overruled" Mr. Smart's decision. As there is no contemporaneous evidence in the record to support Mr. Levy's declaration, it does not create a genuine issue of fact. *Anderson v. Jackson*, No. CV 04-2649 CAS (JWJx), 2006 U.S. Dist. LEXIS 103218, at *22 (C.D. Cal. Aug. 30, 2006) (J. Snyder) (a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact).

| | |
|---|---|
| • **June 6-7, 2013/August 15, 2013/December 3, 2013**: Third party importer MHW, Inc. ships a total of 8 bottles Wild Geese branded Premium and Golden Rums to 3 separate distributors in the U.S. | Providing unsolicited free samples does not constitute trademark use in commerce. *See TAO Licensing, LLC v. Bender Consulting Ltd.*, 125 U.S.P.Q. 2d 1043, 1055, 2017 WL 6336243 (T.T.A.B. 2017) (providing free samples not *bona fide* use); *ZAZU Designs v. L'Oreal S.A.*, 979 F.2d 499, 505 (7th Cir. 1992) (providing samples is a "pre-marketing maneuver" that is "insufficient to establish rights in a trademark").[7] (Dkt. 299 at 7:15-23). |
| • **March 5, 2014**: TTB issues/approves COLA for Untamed Revolutionary Rum | There is no evidence that, as of this date, the labels were affixed to products that were available for sale in the U.S. In fact, it is not possible to legally sell alcoholic beverages in the U.S. until after the labels are approved. *See* 27 U.S.C. § 205(e). |
| • **April 11, 2014**: Lodestar "sells into" the U.S. 2000 cases of Untamed Revolutionary Rum.<br><br>• **August 25, 2014**: Lodestar sells into the U.S. 419 cases of Wild Geese Premium Rum. | Merely importing and warehousing product in the U.S. does not constitute *bona fide* use in commerce because there is no evidence that, as of that date, the products were available for sale in the U.S. *See, e.g., Brookfield*, 174 F.3d at 1052 (*bona fide* use requires that marks be used "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark"). *See also* Dkt. 299 at 7:9-12. Plaintiff admits that the vast majority of those products remained "in bond" and unavailable for sale until Plaintiff paid federal excise tax on them. (Dkt. 299, Exs. 2, 3; 281-2 at 20 n.6). No sale to distributors until January 2015. (SUF 44). |
| • **August 6, 2014**: MHW sends three sample bottles of the Untamed Revolutionary Rum to a distributor. | Providing free samples does not constitute trademark use in commerce. (*See infra*; Dkt. 299 at 7:15-23). |

Plaintiff's contention that sales of Wild Geese branded whiskey since 2009 constitutes *bona fide* use of the "UNTAMED design/word mark" is wrong. There is

---

[7] Plaintiff's reliance on *Grant Time Corp. v. Watch Factory Corp.* for the proposition that samples constitute trademark use is misplaced. 2011 WL 2412960 *6 (N.D. Tex. June 10, 2011). There, the shipments at issue were not samples at all—but actual *sales* in which the plaintiff received over $500.00. In any event, even if the samples at issue constituted trademark use in commerce it would *still* not negate abandonment here because there is no evidence that Avalon or Protégé—let alone Lodestar—even knew or directed that third-party importer MHW ship these unsolicited samples.

no evidence that the UNTAMED *WORD* MARK has *ever appeared on any bottle of whiskey sold by Plaintiff in the U.S.* (Def. SUF 49, 101). The USPTO "accepting" an image of the bottle label for Wild Geese whiskey as a valid specimen for the UNTAMED WORD MARK (Dkt. 300 at 2 n.1) is unavailing. A USPTO decision regarding the continued use of a trademark is *not* binding authority and does *not* constitute undisputed proof of use in commerce. *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, 57 F. Supp. 3d 1203, 1218 (C.D. Cal. 2014). Lodestar cites no authority to the contrary.[8]

Since there is no proof it ever used the UNTAMED WORD MARK in U.S. commerce prior to the BACARDI Ad Campaign, Plaintiff essentially asks this Court to find it has priority of rights in the UNTAMED WORD MARK based solely on its prior sale of WILD GEESE branded whiskey, which bore the distinctly different UNTAMED DESIGN. Courts use "exceedingly strict" standards to determine whether a trademark holder may "tack" its first use date in an earlier used mark[9] to a different mark used later. Such tacking should be allowed only "if two marks are so similar that consumers generally would regard them as essentially the same." *Brookfield*, 174 F.3d at 1048 (rejecting tacking priority of "The Movie Buff's Movie Store" to "MOVIEBUFF.COM" where trademark owner did not show consumers view the terms as identical); *see also Am. Paging*, *Inc. v. Am. Mobilphone*, *Inc.*, 13 U.S.P.Q.2D (BNA) 2036, 2039 (T.T.A.B. Nov. 15, 1989); *Pro-Cuts v. Schilz-Price Enters.*, 27 U.S.P.Q.2D (BNA) 1224, 1227 (T.T.A.B. June 1, 1993). Here, Plaintiff admits that the UNTAMED DESIGN is materially different from the UNTAMED WORD MARK (by abandoning its infringement claim of the UNTAMED DESIGN)

---

[8] While a specimen of use submitted to the USPTO need not be identical to the registered mark to constitute use of that mark, it must "create essentially the same commercial impression." TMEP §1604.13. Here, the fact that Lodestar had no sample use of the UNTAMED WORD MARK to submit to the USPTO proves the point.
[9] As set forth in Defendants' opening brief, such use of the UNTAMED DESIGN was merely ornamental and did not even constitute *bona fide* trademark use in commerce. (Dkt. 295 at 8:16-9:6).

and Plaintiff has proffered no evidence that consumers view the marks as identical. Plaintiff's own marketing expert opined that the UNTAMED DESIGN makes a different commercial impression on consumers than the UNTAMED WORD MARK. (Dkt. 289-33 at ¶ 10). Thus, even if use of the UNTAMED DESIGN on Wild Geese brand whiskey constitutes trademark use, the Court should not allow Plaintiff to rely on such use to support a claim of infringement of the UNTAMED WORD MARK.

Lodestar claims "[i]t is irrelevant if actual use occurred before, after, or during Bacardi's first use in November 2013" because it owned a trademark registration for the mark UNTAMED that it claims gives it "the absolute right to use its mark as it sees fit" including to "combat" infringing use. This argument misses the point, as it incorrectly assumes that Plaintiff had use of the UNTAMED WORD MARK in commerce to support the registration *before* the alleged infringement. The priority date, as well as any presumptions afforded to Plaintiff's trademark registrations, are nothing more than *rebuttable* presumptions.[10] *Kleven v. Hereford*, No. CV 13-02783-AB (AGRx), 2015 U.S. Dist. LEXIS 111185, *67 (C.D. Cal. Aug. 21, 2015). Where, as here, the evidence shows that Plaintiff never made *bona fide* trademark use in commerce necessary to support the registration prior to the alleged infringing use, such presumptions are rebutted. For example, in *Teal Bay Alls.*, *LLC v. Southbound One, Inc.*, No. MJG-13-2180, 2015 U.S. Dist. LEXIS 10940, at *29-34 (D. Md. Jan. 26, 2015), the court found that defendant rebutted the presumption of prior rights afforded by plaintiff's U.S. trademark registration by demonstrating that as of defendant's first use in commerce, plaintiff's use of the mark was merely ornamental and did not constitute *bona fide* trademark use in commerce, even though plaintiff eventually made trademark use of the mark *after* defendant commenced its use.

---

[10] Plaintiff's contention that "Bacardi would not cite or rely on *Reardon*… unless 'UNTAMED' and 'UNTAMEABLE' are legally equivalent" is absurd. Defendants' cite *Reardon* for the proposition that legitimate use in commerce—not registration—is the source of trademark rights in the U.S. Moreover, contesting Plaintiff's prior rights necessary to assert infringement is not an admission that infringement exists.

Lodestar's suggestion that the Madrid Protocol affords it a five year grace period to commence use in commerce is also wrong. "While use as a mark in the United States is not required to *obtain* a Madrid Protocol extension of protection under § 66(a), **use is required within a reasonable time or the protection is subject to cancellation for abandonment**." McCarthy § 19:31.60 (emphasis added); *SaddleSprings*, *Inc. v. Mad Croc Brands*, *Inc.*, Cancellation No. 92055493, at 9 (T.T.A.B., Sept. 25, 2012).[11] Plaintiff's own authority confirms a "registrant must use the registered mark in commerce in order to avoid abandonments of its registrations." *Dragon Bleu (SARL) v. VENM, LLC*, 112 U.S.P.Q.2d 1925, 1930 (T.T.A.B. 2014).

Plaintiff's efforts to produce and sell a rum product branded "Untamed Revolutionary Rum" *only after* the launch of the BACARDI Ad Campaign also does not constitute *bona fide* trademark use. It is undisputed that Untamed Revolutionary Rum did not ship to any retailers in the U.S. until January 2015, long after the abandonment period expired. Plaintiff's creation of a new product *after* the launch of the BACARDI Ad Campaign, with labels that bore no resemblance to its existing line of "award winning" rum and whiskey products, was clearly a bad faith effort to manufacture a basis for litigation and cannot sustain a valid infringement claim. Indeed, Plaintiff *admits* the product was manufactured "to combat Bacardi." (Dkt. 300 at 9:2-4). This cannot be accepted as *bona fide* use in commerce.[12]

---

[11] A party need not wait three years to challenge the mark for nonuse. If, at any time after registration, a party can prove that a registrant is not using and has no intention to resume use of the mark, the registration may be cancelled on the basis of nonuse. *See e.g.*, *ShutEmDown Sports, Inc. v. Carl Dean Lacy*, Cancellation No. 92/049,692, at 26-27 (T.T.A.B. Feb. 22, 2012) (citing precedents).

[12] It would be inequitable to allow a party to manufacture entirely new use of a trademark after an alleged infringement to make it closer to the alleged infringing use to claim it was injured by the alleged confusion it deliberately attempted to create after defendant commenced use. To hold otherwise would negate the *bona fide* use in commerce requirement by permitting plaintiffs to maintain registrations not for the proper purpose of identifying the source of legitimate products but solely for the purpose of filing lawsuits.

## B.    THERE IS NO LIKELIHOOD OF CONFUSION[13]

Lodestar has not provided "sufficient evidence to permit a rational trier of fact to find that confusion is 'probable,' not merely 'possible'" and that Defendants' use of the mark was "likely to confuse an appreciable number of people as the source of the product" *See M2 Software*, *Inc. v. Madacy Ent.*, 421 F.3d 1073, 1080 (9th Cir. 2005).[14] In the absence of any factual evidence supporting a likelihood of confusion, Plaintiff offers an "expert linguist" to opine that the ***words*** "untamed" and "untameable" are similar. Because the linguist admittedly did not compare the ***marks*** at issue in their entirety *as they appear in the marketplace*, this opinion is completely irrelevant to the likelihood of confusion analysis and should be stricken from the record. Even if he had properly compared the marks at issue, a linguistic analysis is *still* entirely improper to assess how a reasonably prudent consumer would perceive the marks in the marketplace and cannot prevent summary judgment to the contrary. (*See* Dkt. 295 at 12 n.15; 298-2 at 14 n.16).

### 1.    The UNTAMED WORD MARK Is Weak

Plaintiff argues, based on the opinion of an "expert linguist," who admittedly did not consider any typical uses of the words in the context of alcoholic beverages, that the UNTAMED WORD MARK has only an arbitrary connection to the goods to which it refers. (Dkt. 281-2 at 11:12-14). This opinion is contrary to the evidence in the record demonstrating that the term "untamed" (and variants thereof) are *frequently* used to describe or suggest a characteristic or quality of alcoholic beverages. (Dkt. 298-2 at 14:9-15:14). The UNTAMED mark is therefore "suggestive" of alcoholic

---

[13] Lodestar represents "it intend[s] to move forward on the infringement claims relating only to the '239 Registration for the UNTAMED word mark." (Dkt. 281-2 at 7:26-28 n. 1). Thus, the Court should grant summary judgment in Defendants' favor on all claims relating to the '238 Registration for the UNTAMED DESIGN.

[14] Plaintiff incorrectly states that the *Dreamwerks* court found three of the *Sleekcraft* factors "pivotal" in all reverse confusion cases. (Dkt. 281-2 at 10:8). This Circuit considers all the factors. *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002); *Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 987-1004 (C.D. Cal. 2002).

beverages and not considered "strong" without a showing of "significant marketplace recognition" that is not supported by this record. *See Core Nutritionals*, *LLC v. Performance Nutrition Formulators*, *LLC*, No 16-CV-705 TJH, 2016 WL 9088702, at *2 (C.D. Cal. Sept. 28, 2016).

Even if Plaintiff could prove that the UNTAMED WORD MARK is arbitrary, the mark would *still* be conceptually weak because at least 28 other alcohol products,[15] including whiskey, use the term "untamed." (Dkt. 289 Exs. 35-36; 298-2 at 14:24-15:5). Indeed, Plaintiff's reliance on *Patron Spirits Int'l v. Peter W. Noyes* only *confirms* that evidence of extensive use of a term by others "can be powerful evidence of weakness." 2016 WL 7010641, at *6 (T.T.A.B. 2016) (not precedential). Plaintiff's argument that the mere registration of the mark deems it "strong" for purposes of a likelihood of confusion analysis is wrong. The *Zobmondo Entm't, LLC v. Falls Media, LLC* case relied on by Lodestar specifically notes that "[f]ederal registration in itself does not mean that [registrant] can necessarily survive summary judgment solely on the basis of its registration," and found a genuine issue of material fact as to whether the registered mark at issue was distinctive. 602 F.3d 1108, 1113-20 (9th Cir. 2010). (quotations and citations omitted).

### 2. The Parties' Respective Uses in the Marketplace are Different

Plaintiff improperly compares only a portion of the parties' respective marks, without considering the ways consumers encountered them in the marketplace. (Dkt. 281-2 at 12-13). "[E]ven identical marks may be readily distinguishable in light of other packaging or promotional material affecting the context in which they are

---

[15] This extensive evidence is not "unauthenticated hearsay" (Dkt. 300 at 15:9-10) as it is not being offered for the truth of the matters asserted (*i.e.* that Lady Bligh rum is "spirited and untamed") but to illustrate such extensive third-party use of the term "untamed." The documents can be authenticated under Rule 901 because the sworn declaration states that the documents were obtained from online sources at Mr. Lynch's direction and the documents contain "circumstantial indicia of authenticity (such as the dates and web addresses)" that would support a reasonable juror in the belief that the documents are what Defendants say they are. *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1154 (C.D. Cal. 2002); *see also* 5 Federal Rules of Evidence Manual § PT4.04 (2019).

encountered." *Isle of Capri*, 2016 U.S. Dist. LEXIS 152203 at *14-15 (J. Snyder). The opinion of Plaintiff's linguistic expert, who admittedly compared only the ***words*** "untamed" and "untameable" in isolation has no evidentiary value. This expert conceded: "[y]ou don't need any analysis at all to find that [BACARDI UNTAMEABLE] is something different [than UNTAMED]." (Def. SUF 54). As shown below, the parties' marks as they appear in the marketplace are neither identical nor confusingly similar:

| Lodestar's Alleged Use Before the BACARDI Ad Campaign (Dkt. 299, Ex. 20) | BACARDI Ad Campaign (Representative Images) (Dkt. 299, Ex. 19) |
|---|---|
|  **Wild Geese Classic Blend Whiskey**  **Wild Geese Limited Edition Whiskey** |    |

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT



**Wild Geese Single Malt Whisky**





**Wild Geese Rare Irish Whiskey**



*See* **Exhibit 6**, a CD-ROM containing the "Bacardi Untameable Since 1862" television commercial, which was produced in this action under Bates number BUSA0000265.

The BACARDI brand used "Bacardi Untameable Since 1862" only as an advertising tagline alongside the BACARDI brand's bat logo in ads that were disseminated on nationwide tv, outdoor, print, and digital/mobile executions. (Def. SUF 63, 100). The tagline was not used on any BACARDI products. Plaintiff used the UNTAMED DESIGN only ornamentally on whiskey labels that predominately displayed its Wild Geese brand name before the BACARDI Ad Campaign. A year after the BACARDI Ad Campaign, Plaintiff commenced sale of rum in the U.S. that used the UNTAMED WORD MARK in advertising copy on the back of rum bottles and a small quantity of rum branded Untamed Revolutionary Rum that it admittedly created to "combat Bacardi." (Def. SUF 27).

Lodestar's contention that "[c]ourts routinely hold that use of a famous house

mark in connection with a non-descriptive mark aggravates the likelihood of confusion" false and contradicted by the authority Plaintiff cites. *See Americana Trading*, *Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1287 (9th Cir. 1992) (both parties agreed the mark at issue was *descriptive*). Lodestar's further contention that Defendants rely only on cases where "a famous mark is used with a descriptive mark" is also false. In *Moose Creek*, *Inc. v. Abercrombie & Fitch Co.*, the marks were deemed *arbitrary* and the Court still held the defendant's use of its famous house mark would likely ***mitigate*** reverse confusion. 331 F. Supp. 2d 1214, 1223 (C.D. Cal. 2004); and in *Behr Process Corp. v. RPM Int'l*, *Inc.*, the mark was deemed "distinctive" and the Court held defendant's use of its house mark "ha[d] the potential to ***reduce or eliminate*** the likelihood of confusion." No. CV 14-156-JLS (DFMx), 2014 U.S. Dist. LEXIS 195349, *8 (C.D. Cal. Feb. 14. 2014).

Lodestar's attempt to distinguish *Cohn v. Petsmart* is unavailing. 281 F.3d 837, 842 (9th Cir. 2002). First, the court in *Petsmart* noted that it was an "unusual case" because it found no likelihood of confusion "even though the parties use the same mark for similar goods and services." *Id.* at 843. Thus, the facts in *Petsmart* were even more favorable for the plaintiff than the facts here and the court *still* found no likelihood of confusion. Second, Lodestar's contention that it "does not use any business name in connection with UNTAMED, which makes *Petsmart* inapplicable" is false. All products Plaintiff allegedly offered for sale in the U.S. before the BACARDI Ad Campaign are branded prominently with Wild Geese. Even the label for Untamed Revolutionary Rum, which was concocted for purposes of this litigation after the launch of the BACARDI Ad Campaign, reads: "PART OF THE AVALON GROUP'S… WILD GEESE SOLDIERS & HEROES COLLECTION." (Dkt. 300-3, Ex. I p. 42). Moreover, Defendant's use of the famous house mark BACARDI as the first element of the Bacardi Untameable Since 1862 tagline would still easily distinguish the tagline from the UNTAMED WORD MARK. (Dkt. 198-2 at 18:9-17). Plaintiff's own linguistic expert concedes: "'Bacardi' is obvious[ly] a very

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

longstanding mark and doesn't need my analysis" and that BACARDI "is also a very well-established brand." (Dkt. 299, Ex. 7 (Leonard Tr. 36:9-14)).

Plaintiff's claim that Bacardi U.S.A. allegedly "used [the word] 'untamed' when referring to its UNTAMEABLE campaign on social media" (Dkt. 300 at 16:3-5) is false. The social media examples presented by Plaintiff merely show the word "untamed" used *to describe people at a music festival*. Moreover, these social media posts are unauthenticated hearsay and should not be considered. Plaintiff's claim that Bacardi "admitted that UNTAMED is shorthand for UNTAMEABLE" is also false.[16]

As set forth in Defendants' Opposition, Plaintiff's claim that there is "*substantial evidence* that *consumers* associate the [term] UNTAMED with the [BACARDI] UNTAMEABLE campaign" based solely on a selection of inadmissible, anonymous social media posts cherry picked by its linguistic expert, Dr. Leonard, is false and neither relevant to the confusion analysis, nor supported by any credible evidence. (*See* Dkt. 298-2 at 19:9-20:18).

### 3.     The Parties' Products Are Not Similar

As set forth in Defendant's opening brief, rum and whiskey are different products and are distinguishable. (Dkt. No. 295 at 12:21-13:17; 298-2 at 20:19-21:1). Plaintiff has presented no *evidence* that the products are similar.

### 4.     There is No Evidence of Actual Confusion

Lodestar admits that it is unaware of any U.S. consumers who have been confused as to the source of its products. (Def. SUF 55-59). Where, as here, the marks allegedly co-existed for years, this weighs *against* a likelihood of confusion. (Dkt. 289-1 13:23-14:6). The results of a consumer survey conducted by Defendants' expert demonstrates that consumers who viewed the BACARDI Ad Campaign *did not believe* that Plaintiff's alleged products were made by, affiliated or associated with,

---

[16] Redlien testified: "*I can't recall anything being untamed*. I mean, the campaign was Bacardi Untameable Since 1862. Like, *in general, people may try* to shorthand it, but the campaign was Bacardi Untameable Since 1862." (Dkt. 299, Ex. 5).

or received a license from the company that released the ad. (Def. SUF 75).

The anonymous social media posts admittedly cherry-picked by Plaintiff's expert without any reliable methodology do not even demonstrate any legally cognizable actual consumer confusion on their face. To find actual reverse confusion, the evidence must show that prospective consumers of Plaintiff's products incorrectly believe that Plaintiff's product is associated with the BACARDI brand or products. *See Walter v. Mattel, Inc.*, 31 F. Supp. 2d 751, 760 (C.D. Cal. 1998). These anonymous social media posts make no mention of Plaintiff or its products. There is no evidence that the posters had even heard of Plaintiff or the purported UNTAMED MARKS—let alone were confused as to an affiliation with the BACARDI brand or BACARDI Ad Campaign.

Plaintiff's purported likelihood of confusion survey should also be disregarded as unreliable. (*See* Dkt. 299-22 at ¶¶ 9, 12-13). As set forth in Defendants' Opposition, a litigation survey must replicate marketplace conditions—that is, the real world conditions under which a typical consumer might encounter a product in the marketplace.[17] (Dkt. 298-2 at 22:1-19).

### 5.     The Parties' Marketing Channels Are Different

As set forth in Defendant's opening brief, the parties' marketing channels are different. (Dkt. 295 at 14:16-15:6). Lodestar's argument that "Bacardi . . . markets its rum on social media and online" fails. The mere fact that two companies have an online presence is insufficient to show overlapping marketing channels. *Network Automation*, 638 F.3d at 1151; *Isle of Capri*, 2016 U.S. Dist. LEXIS 152203 at *19. That both parties' products are sold at liquor stores is also irrelevant because the "Untameable" was not used as a product name or on bottles or packaging. Thus, a consumer would never encounter Plaintiff's purported products and the "Bacardi Untameable Since 1862" tagline in proximity to each other.

---

[17] Plaintiff's claim that Scott's survey is "unrebutted" is false. *See* Butler Decl. (Dkt. 299-22) and Butler's conflicting survey results. (Dkt. 289-50).

### 6.    Consumers Exercise Care in Buying Alcoholic Beverages

As set forth in Defendant's opening brief, purchasers of alcoholic beverages tend to exercise a high degree of care when making their purchasing decisions. (Dkt. 295 at 15:7-12). The cases cited by Plaintiff merely demonstrate that confusion necessarily depends on the context where consumers will encounter the marks in question. Moreover, in all of those cases, the use of the respective marks on product labels and in product names contributed to the findings of confusion. Here, the alleged infringing mark was not used as a product name or on bottles or packaging, which dispels any chance of confusion. In addition, Plaintiff claims its brand "is a *premium* alcoholic product line" and that its newest products are "*super*-premium," which would suggest an upscale consumer with a high degree of sophistication and care. (Dkt. 281-2 at 3:25, 22:9-11).

### 7.    Defendants' Mark Was Selected in Good Faith

As set forth in Defendant's opening brief, there is no evidence that either the outside ad agency that came up with the "Bacardi Untameable Since 1862" tagline, or the Defendants or their affiliates were even *aware* of Lodestar or its purported UNTAMED MARKS when they selected the BACARDI UNTAMEABLE [Since 1862] mark, let alone any evidence that they selected that mark with an intent to cause consumer confusion. Plaintiff's claim that "infringement is *willful* when a junior user had knowledge of the senior users' mark" is not even relevant to the issue of likelihood of confusion; it is relevant to the issue of *monetary remedies*. Regardless, even if Lodestar could demonstrate "actual knowledge," mere knowledge is insufficient to establish willfulness. (Dkt. 295 at 15:13-16:26; 298-2 at 23:17-25:9).

Plaintiff's reliance on *Bellagio Jewelry*, *Inc. v. Croton Watch Co.* is misplaced. No. CV 06-6672 ODW (RZx), 2008 U.S. Dist. LEXIS 130262, at *26 (C.D. Cal. Aug. 19, 2008). In *Bellagio*, the court found that the parties' **identical marks**, both used on watches, were confusingly similar and that defendant's conduct became willful only after it received a cease-and-desist letter that contained sufficient information for the

defendant to verify that plaintiff's *identical mark* was registered for use on *identical goods*. Here, Plaintiff alleges only that its U.S. trademark registration (and other third party registrations) appeared on a trademark search report produced by Bacardi & Co. This alone is insufficient to establish willfulness—particularly where, as here, the parties' marks **are not identical**; Bacardi never branded product with the mark; and Plaintiff's use prior to the BACARDI Ad Campaign was limited to ornamental use of the UNTAMED DESIGN on whiskey. *Am. Auto. Ass'n*, 367 F. Supp. 3d at 1103; *M2 Software Inc. v. Viacom Inc.,* 223 F. App'x 654, 653 (9th Cir. 2007).

### 8.     There is No Likelihood of Further Expansion

As set forth in Defendant's opening brief, courts do not consider expansion efforts after a party files suit. (Dkt. No. 295 at 16:27-17:9; 298-2 at 25:10-18). Plaintiff does not dispute that this factor supports Defendants.

## III.   LODESTAR IS NOT ENTITLED TO MONETARY RELIEF[18]

### A.     LODESTAR CANNOT ESTABLISH THAT IT SUFFERED AN INJURY AS A RESULT OF DEFENDANTS' ALLEGED INFRINGEMENT

Lodestar does not dispute that to recover damages under the Lanham Act, it "must prove both the fact and the amount of damage" with "reasonable certainty." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993) (abrogated on other grounds). Instead, Lodestar argues that it has met this burden by proving "actual confusion" through the expert report of Dr. Carol Scott. (Dkt. 303-1 at 21:6-11). Dr. Scott's report, however, does not even *purport* to determine the existence of actual confusion; she claims to assess only the *reliability* of the survey conducted by Defendants' expert. (Dkt. 289-33 at ¶ 5). In any event, Dr. Scott's survey does not serve as a reliable basis on which to measure confusion in the marketplace, and

---

[18] Lodestar states that it is "not seeking damages under a disgorgement theory" (Dkt. 303-1 at 25 n.3), and does not contest Defendants' motion with respect to Lodestar's claims for monetary relief under California law. Summary judgment on those claims should therefore be granted in Defendants' favor.

Lodestar *admitted* that it was unaware of any U.S. consumers who had been confused as to the source of its products. (SUF 55-59).

Even if Lodestar could prove actual consumer confusion, Lodestar does not dispute that *any injury arising from such confusion would have been borne by Avalon* (the alleged exclusive licensee of the UNTAMED MARKS), *not by Lodestar* (██████ ██████████████████████████████████████████████████████████). *See Blau v. YMI Jeaswear, Inc.*, No. CV 02 09551 FMC SHSX, 2004 WL 5313967, at *3 (C.D. Cal. Jan. 2, 2004) (denying damages to trademark owner whose revenue was not tied to the value of the mark under the license agreement). Indeed, in *Sands, Taylor & Wood v. Quaker Oats Co.*, which Lodestar describes as the "seminal" reasonable royalties case (Dkt. 303-1 at 18:15-17), the court awarded royalties to the *exclusive licensor* of the trademark, *not* the owner. 34 F.3d 1340, 1345 n.4 (7th Cir. 1994). Because Lodestar cannot demonstrate that it suffered any injury as a result of Defendants' alleged infringement, it is not entitled to damages as a matter of law.

## B.   LODESTAR IS NOT ENTITLED TO REASONABLE ROYALTIES

### 1.   Lodestar Cannot Demonstrate a Reliable Basis on Which to Calculate a Reasonable Royalty Rate

Lodestar does not dispute that reasonable royalties are appropriate *only* where "the evidence provides a sufficiently reliable basis from which to calculate them." (Dkt. 303-1 at 18:28-19:1). Nor does Lodestar dispute that courts have found such "sufficiently reliable bas[e]s" only where: (1) the parties had a prior trademark license agreement; (2) the parties had previously *negotiated* a trademark license or purchase agreement; or (3) the plaintiff had previously licensed trademarks to unaffiliated third parties. (SUF 114). Indeed, the cases that Lodestar cites only *confirm* these requirements.[19] Here, it is undisputed that: (1) the parties do *not* have any prior license

---

[19] *See Sands*, 34 F.3d at 1343 (plaintiff had previously licensed the mark a third party); *Bauer Bros., LLC v. Nike, Inc.*, 159 F. Supp. 3d 1202, 1209, 1214 (S.D. Cal.

agreements; (2) the parties have *never* negotiated the license or purchase of any trademark; and (3) Lodestar has *never* licensed the UNTAMED MARKS to an unaffiliated third party. (SUF 114).

Lodestar's reliance on Defendants' alleged "history of acquiring smaller alcohol brands" (Dkt. 303-1 at 20:27) is inappropriate. *None* of those acquisitions mirrors the type of hypothetical trademark license that Lodestar is proposing as the basis for its reasonable royalty award, nor is there *any* evidence to suggest that any of those acquisitions even involved the payment of royalties. (Lynch Reply Decl., Ex. 2 at 68:12-17; Ex. 3 at 182:6-184:8). In any event, Ninth Circuit courts look to the prior licensing activities of the *plaintiff, not* the defendant, in determining whether there is a reliable basis on which to calculate reasonable royalties.

The opinions proffered by Lodestar's industry expert, Sidney Blum, and its damages expert, Dr. Barbara Luna, do not alter this analysis. Mr. Blum, who opined that, based on his alleged "licensing experience in the alcohol industry . . . it is common for larger international alcohol companies . . . to obtain rights to smaller alcohol companies" (Dkt. 303-1 at 20:18-20) conceded that: (1) that "opinion" is not an opinion at all, but merely a "statement of fact"; (2) he did not examine the facts of this case, and therefore has *no* opinion as to whether it would be reasonable to assume that *Defendants* would have been willing to license or acquire the rights to the *UNTAMED MARKS*; (3) his alleged "licensing experience" involved merely *auditing* Diageo's *existing* royalty agreements to confirm compliance with payment obligations, *not* determining whether to enter into those agreements or setting the terms of those agreements; and (4) the Diageo agreements that he audited were not

_____

2016) (plaintiff had previously licensed marks to third parties and defendant had offered to pay plaintiff for the right to use the marks at issue); *QS Wholesale, Inc. v. World Mktg.*, Inc., No. SA 12-CV-0451 RNBX, 2013 WL 1953719, at *5 (C.D. Cal. May 9, 2013) (parties had previously engaged in negotiations for the purchase of the mark); *adidas America, Inc. v. Payless Shoesource, Inc.*, No. CV 01-1655-KI, 2008 WL 429812, at *12 (D. Ore. Sept. 12, 2008) (plaintiff had previously entered into trademark royalty agreements with third parties).

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1   even *comparable* to Lodestar's proposed hypothetical agreement with Defendant;

2   they involved circumstances where Diageo licensed *out* its trademarks for use on

3   consumer goods. (Lynch Reply Decl., Ex. 3, *passim*). Moreover, even if Lodestar

4   could prove that large alcohol companies "sometimes" acquire smaller alcohol

5   companies (*Id.* at 159:1-9), this fact is irrelevant—the mere existence of third-party

6   license agreements in the relevant industry does not provide a "sufficiently reliable

7   basis" on which to calculate a reasonable royalty rate. While Mr. Blum identifies one

8   actual agreement—a 2012 agreement between Diageo and Beams International with

9   an alleged royalty rate of "4% to 5% of net sales" (Dkt. 300-5 ¶ 56)—that agreement

10  is *not* comparable to the hypothetical negotiation here because it allegedly involved

11  the licensing *out* of Diageo's trademarks. (Lynch Reply Decl., Ex. 3 at 248:18-25).

12  Moreover, Mr. Blum did *not* produce a copy of that alleged agreement despite

13  Defendants' subpoena demand, nor any other evidence to prove either the existence

14  of that agreement or the alleged royalty rate. (*Id.* at 247:13-248:17).

15      In addition, the "starting hypothetical royalty rate" that Mr. Blum identified is

16  untethered to the facts of this case, and based merely on data from a 2016 third-party

17  survey, in which experts were asked to opine on appropriate royalty rate ranges for

18  different categories of agreements. (*Id.* at 222:17-25, 225:21-25, 256:12-14, 258:3-

19  10, 270:1-7); Ex. 4 at 71:8-73:2)). Because that data is not even based on *actual*

20  license agreements, it is impossible to determine whether the circumstances giving

21  rise to those purported royalty rates are comparable to the facts of this case. (Lynch

22  Reply Decl., Ex. 3 at 269:12-270:7; Ex. 5 ¶¶ 37-42; Ex. 4 at 71:8-73:2)).[20]

23      Dr. Luna also failed to establish any reliable basis on which to calculate a

24

25  _____

26  [20] Mr. Blum also cited "csimarket.com," which purports to show profit margins in the alcohol industry, but conceded that he does not know, and has made no effort to determine, whether that is a source on which experts in his field rely. (Lynch Decl.,

27  Ex. 3 (Blum Dep. 232:18-233:14)). He also conceded that he did not even understand much of that data—including the data that he *explicitly referenced* in his report. (*Id.* (Blum Dep. 238:16-239:9, 241:1-242:4, 244:9-245:10)). In any event, it is unclear

28  whether and how this data affected his opinions. (Dkt. 303-1-5 ¶ 53).

1     reasonable royalty. ████████████████████████

2     ███████████████████████████████████████████████

3     ███████████████████████████████████████████████

4     ███████████████████████████████████████████████

5     ██████████████ (Lynch Reply Decl., Ex. 2 at 189:15-22; 191:19-192:1; Ex. 1 at

6     455:21-459:2)). Dr. Luna's reliance on what she claims are "comparable" third-party

7     licenses is also improper because: (1) those licenses are *not comparable on their*

8     *face[21]*; and (2) even if they were, Lodestar does not identify a *single* case where a

9     court has held that unrelated, third-party agreements can provide a "sufficiently

10     reliable basis" on which to calculate a reasonable royalty rate.

              **2.**     **Lodestar Cannot Establish That Any Portion of Defendants' Sales Was Attributable to the Alleged Infringement**

11

12          Lodestar concedes that it is entitled to seek a reasonably royalty only "on

13     [Defendants'] net sales in the U.S. *that have been realized through [Defendants'] use*

14     *of the [BACARDI] UNTAMEABLE mark*." (Dkt. 303-1 at 18:10-12) (emphasis

15     added). Thus, even if Lodestar could establish a reasonable *rate* on which to calculate

16     royalties, it is entitled to apply that rate only to the portion of Defendants' sales

17     *attributable* to the alleged infringement. In *Sands*, for example, the court applied a

18     reasonable royalty rate to the defendant's sales "during the period of infringement

19     (*minus the pre-infringement sales* level)." 34 F.3d at 1345 (emphasis added). Here,

20     Lodestar has undertaken *no effort* to demonstrate what portion of Defendants' sales,

21

---

22   [21] The agreements are not comparable because they are either: (1) for the use of
23   alcohol brand names on consumer goods; (2) for the use of iconic names; (3) granting
     rights *other* than trademark licenses; or (4) between related parties. (Lynch Decl., Ex.
24   5 ¶¶ 55- 61, Ex. 2). ███████████████████████████████
                                                   (Lynch
25   Decl., Ex. 2 (Luna Dep. 65:22-66:10, 216:7-22, 222:1-223:3, 223:17-21)). This court
     previously granted the defendant's request to exclude Dr. Luna's testimony regarding
26   royalty rates *on this very basis*. *Man Mach. Interface Techs., LLC v. Vizio, Inc.*, No.
     SACV100634AGMLGX, 2012 WL 13014967, at *8 (C.D. Cal. Feb. 27, 2012)
27   (finding Luna's royalty rate computation "unreliable" because she relied on
     agreements that were "'easily distinguishable from any hypothetical licensing
28   agreement that [the parties] may have entered," and she conceded: "**that is the best I**
     **could find**.") (emphasis added).

if any, was attributable to the Bacardi Ad Campaign. Nor could the Court estimate that amount by subtracting Defendants' pre-infringement sales levels from its sales during the infringement period (as the court did in *Sands*) ███████████ ██████████████████████████████████████████. (SUF 109).

Lodestar argues that royalties are not unwarranted merely because Defendants' "did not receive the benefit that [they] intended when [they] adopted the infringing mark" (Dkt. 303-1 at 22:21), but this mischaracterizes Defendants' position and the controlling law. A plaintiff is not entitled to royalties on *hypothetical* sales that the defendant purportedly *predicted* at the time of the alleged infringement—it is entitled to royalties on sales that the defendant *actually made* as a result of the infringement. *Tokidoki, LLC v. Fortune Dynamic, Inc.*, No. CV 07-1923DSF(PJWX), 2009 WL 2366439, at *14 (C.D. Cal. July 28, 2009); *Computer Access Tech. Corp. v. Catallyst Enters., Inc.*, 273 F. Supp. 2d 1063, 1077 (N.D. Cal. 2002); *Color me Mine Enters. Inc. v. S. States Mktg. Inc.*, No. CV 12-00860 RGK-(JCx), 2013 WL 12119715, at *8 (C.D. Cal. Apr. 25, 2013)[22]; *Sands*, 34 F.3d at 1345. Because Lodestar cannot demonstrate that *any sales* were made as a result of the alleged infringement, it is not entitled to reasonable royalties as a matter of law.

**C.     LODESTAR IS NOT ENTITLED TO CORRECTIVE ADVERTISING DAMAGES BECAUSE IT CANNOT ESTABLISH THAT THE GOODWILL ASSOCIATED WITH THE UNTAMED MARKS WAS "ACTUALLY DIMINISHED" BY DEFENDANTS' CONDUCT**

---

[22] Lodestar claims that in *Tokidoki*, the plaintiff's witness "testified that the plaintiff does not and would not license the mark at issue"; that in *Color Me Mine*, the plaintiff did not "provide sufficient evidence that both sides were willing to accept a licensing agreement," or that "it had previously entered into similar types of licensing agreements"; and that in *Computer Access*, the court found the damages calculation speculative because the plaintiff "did not distinguish between damages caused by trademark infringement, as opposed to [defendant's] lawful use of the design[.]" (Dkt. 303-1 at 21:12-22:9). Here too, there is *no objective evidence* that Lodestar ever entered into a trademark license with an unaffiliated third-party or would have been willing to enter into one with Defendants; there is *no* evidence that Defendants ever entered into a trademark license or would have been willing to enter into one with Lodestar; and Lodestar has *not* identified the portion of Defendants' sales attributable to the alleged infringement, making any damages award speculative.

As Lodestar acknowledges, the purpose of corrective advertising is to "restore the value of a trademark." (Dkt. 303-1 at 23:8-9). Thus, corrective advertising damages are permitted only where there is "'non-speculative evidence' that the goodwill associated with the plaintiff's mark has actually been diminished by the defendant's conduct." *Int'l Oddities v.* Record, No. CV 12-3934-CAS VBKX, 2013 WL 3864050, at *14 (C.D. Cal. July 22, 2013 (J. Snyder). While "uncertainty as to the *amount* of damages is not fatal," the plaintiff must prove "the foundational *fact* that its mark lost value at all." *Quia Corp. v. Mattel, Inc.*, No. C 10-1902 JF HRL, 2011 WL 2749576, at *6 (N.D. Cal. July 14, 2011).

Lodestar claims that it "has been harmed" because: (1) "Lodestar's consumer survey results . . . demonstrate evidence of actual confusion"; (2) "consumers now associate the 'Bacardi' mark with UNTAMEABLE and UNTAMED"; (3) because Lodestar's alleged "business model is to develop brands and trademarks to be licensed or sold," the alleged "consumer confusion" has "destroyed the potential licensing value" of the UNTAMED MARKS; and (4) Lodestar allegedly spent $5.54 million to "develop and promote" the UNTAMED MARKS. (Dkt. 303-1 at 23:24-24:6). These allegations are unsupported and insufficient to defeat Defendants' motion.

***First***, Lodestar's survey expert did *not* make any findings as to the existence of actual confusion, and did not even purport to conduct a survey designed to do so. (Dkt. 289-33 at ¶ 10; 299-17 at 61:3-11).   In any event, goodwill refers to "the expectancy of continued patronage." *United States v. Mongol Nation*, 370 F. Supp. 3d 1090, 1123 (C.D. Cal. 2019) (internal citation omitted); McCarthy § 2:17. Even if Lodestar could prove a likelihood of confusion, which it cannot, that alone would not demonstrate that the UNTAMED MARKS had any goodwill or lost any goodwill as a result of Defendants' alleged infringement.[23] ***Second***, because actual confusion

---

[23] Nor do Lodestar's *registrations* demonstrate goodwill. Goodwill arises through use in commerce, where the mark comes to "identify the total of all the imponderable qualities that attract customers to the business." *Mongol*, 370 F. Supp. 3d at 1123.

requires mistaken purchasing decisions, Lodestar would need to prove that consumers mistakenly believed that Lodestar's alleged *products* were associated with the BACARDI brand, *not* that Lodestar's alleged *trademarks* were associated with the BACARDI brand, and Lodestar has conceded that there is no such confusion. (Dkt. 295 at 13-14 n.18; SUF 55-59). **Third**, there is no evidence in the record concerning Lodestar's alleged "business model" or its purported intent to license the UNTAMED MARKS to a third party. (Dkt. 299-24 at No. 2) **Finally**, there is no evidence that Lodestar spent *any* money to develop or promote the UNTAMED MARKS or products bearing those marks. (*See* Dkt. 295 at 20 n.22; SUF 104-06). In any event,

████████████████████████████████████████████████████████

████████████████████████████████████████ (SUF 103), the marks' *expected* value is irrelevant; the question is whether those marks actually *possessed* value at the time of the alleged infringement and thereafter suffered a *loss* in value as a result of that infringement.

### D. LODESTAR IS NOT ENTITLED TO ATTORNEYS FEES BECAUSE IT CANNOT DEMONSTRATE THAT THIS CASE IS "EXCEPTIONAL"

It is undisputed that attorneys' fees are recoverable only in "exceptional" cases (Dkt. 303-1 at 25:1), and that cases are "exceptional" only where the defendants' conduct is *willful* and the court finds some "aggravating circumstances or heightened level of culpability." *M2 Software*, 223 F. App'x at 656; *Anhing Corp. v. Thuan Phong Co. Ltd.*, No. CV1305167BROMANX, 2016 WL 6661178, at *3 (C.D. Cal. Jan. 25, 2016). Lodestar claims that it would be "inappropriate" for the Court to deny attorneys' fees because Defendants allegedly: (1) "adopted a confusingly similar mark on the same goods with *actual knowledge* of Lodestar's federal trademark rights"; and (2) "refused to produce the trademark search results or its profit information, unnecessarily forcing Lodestar to have to file motions to compel." (Dkt. 303-1 at 25:9-20). These claims are unsupported and insufficient to defeat Defendants' motion.

*First*, there is no evidence from which a reasonable factfinder could conclude

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

that Defendants had any knowledge of Lodestar or the UNTAMED MARKS when they selected the "Bacardi Untameable Since 1862" tagline (SUF 97), and, in fact, Lodestar acknowledges that it lacks any evidence of willful infringement by *withdrawing its claim for a disgorgement of Defendants' profits*. (Dkt. 303-1 at 25 n.3). ***Second***, "actual knowledge" of a "confusingly similar mark" is insufficient to establish willfulness.[24] (Dkt. 295 at 16:5-9). And ***third***, there is *no evidence* that Defendants "refused to produce" either "the trademark search results" or their "profit information." In *both* instances, Defendants produced the requested materials *before* the Court decided Lodestar's motions to compel, thereby rendering those motions moot. (Dkts. 179; 186; 192; 244; 248; 249; 269). In any event, Lodestar does not cite any authority establishing that a motion to compel renders a case "exceptional." In fact, in its decision on Lodestar's motion to compel the production of Defendants' trademark search reports, the Court specified that "fees and costs associated with th[e] motion should be born by the respective parties." (Dkt. 269). Moreover, Defendants have been forced to file *multiple* motions to compel against Lodestar—including a successful motion to compel the production of Protégé's documents, for which Defendants had to hire local counsel in England and Switzerland to seek discovery under the Hague Convention. (Dkt. 235). If anything, *Defendants* are entitled to attorneys' fees due to Lodestar's systematic pattern of abusive discovery practices that have vexatiously multiplied this litigation.

## IV.   CONCLUSION

For the reasons stated above, the Court should grant Defendants' motion for summary judgment.

---

[24] *Bellagio,* 2008 U.S. Dist. LEXIS 130262, on which Lodestar relies, does not state otherwise. There, the court examined the defendants' intent as part of its likelihood of confusion analysis, not in determining whether attorneys' fees were appropriate, and the facts of that case are distinguishable, as explained above. *See supra*, at 16-17.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED: June 3, 2019

Respectfully submitted,
KELLEY DRYE & WARREN LLP
Michael C. Lynch (*pro hac vice*)


By:   /s/ Michael C. Lynch

Michael C. Lynch
Attorneys for Bacardi & Company
Limited, Bacardi U.S.A., Inc. and
Bacardi Limited

DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT